RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0112p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

C.S., by her next friend, Adam Stroub,

     *Plaintiff-Appellant*,

  *v.*

CRAIG MCCRUMB; AMY LEFFEL; MICHAEL PAPANEK,

     *Defendants-Appellees*.

No. 24-1364

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-10993—Terrence George Berg, District Judge.

Argued: January 30, 2025

Decided and Filed: May 2, 2025

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

─────────────────

**COUNSEL**

─────────────────

**ARGUED:** Eugene Volokh, STANFORD UNIVERSITY, Stanford, California, for Appellant. Daniel J. LoBello, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellee. **ON BRIEF:** Eugene Volokh, STANFORD UNIVERSITY, Stanford, California, John R. Monroe, JOHN MONROE LAW, P.C., Dawsonville, Georgia, Michael F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., for Appellant. Daniel J. LoBello, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellee.

─────────────────

**OPINION**

─────────────────

CLAY, Circuit Judge. Plaintiff C.S., by her father and next friend, Adam Stroub, appeals the district court's grant of summary judgment to Defendants Craig McCrumb, Amy Leffel, and

Michael Papanek in this First Amendment action under 42 U.S.C. § 1983.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  The Oxford Shooting of 2021

On November 30, 2021, in Oakland County, Michigan, fifteen-year-old Ethan Crumbley opened fire on his classmates at Oxford High School in what would become "the deadliest high school shooting in Michigan history."  Stephanie Saul & Anna Betts, *Michigan Teenager Who Killed Four Students Is Sentenced to Life*, N.Y. TIMES (Dec. 8, 2023), https://www.nytimes.com/2023/12/08/us/michigan-oxford-school-shooting-sentencing.html. Armed with a nine-millimeter handgun, Crumbley shot and killed four people under the age of eighteen, and "severely injure[d]" seven others, including a teacher.  Order, R. 25, Page ID #622; *see People v. Crumbley*, 11 N.W. 3d 576, 580–87 (Mich. Ct. App. 2023) (detailing the events leading up to the shooting).  Communities in Oakland County and across Michigan were left reeling from this deadly attack, and the Oxford School District was bombarded with lawsuits brought by current high school students, their next friends, and the estates of the deceased.  *See, e.g., Franz v. Oxford Cmty. Sch. Dist.*, No. 21-cv-12871, 2024 WL 4326812 (E.D. Mich. Sept. 27, 2024).  Some families opted to change school districts[1] as result of this tragedy, which traumatized many students in close proximity to the shooting and inflicted "lasting scars" on Michigan schools.  Order, R. 25, Page ID #622–23, 627.  More than three years later, the impact of the Oxford Shooting "is still felt acutely state-wide."  *Id.*

### B.  Factual and Procedural History

Plaintiff C.S., a minor child, attended Robert Kerr Elementary School ("Robert Kerr" or "the School") in Durand, Michigan, of Shiawassee County, less than an hour's drive from the Oxford School District in Oakland County.  During the 2021–2022 school year, C.S. was enrolled in the third grade and had an Individualized Education Plan ("IEP").  On February 17, 2022, the school observed "Wear a Hat Day" as part of the "Great Kindness Challenge."  School

---

[1]The Oxford School District is a public school system located in Oakland County, Michigan, that consists of both elementary and secondary schools.

Newsletter, R. 17-9, Page ID #418. The Great Kindness Challenge was a weeklong initiative designed to encourage students "to complete as many acts of kindness as possible." *Id.* at Page ID #419. Some of the week's activities included "Kindness dress-up days," during which students could wear special clothing items to school and complete a "Great Kindness Challenge checklist." *See id.* On "Hat Day," students were allowed to wear a hat of their choosing throughout the day as an exception to the usual dress code policy, which only permitted hats to be worn during recess. *Id.* at Page ID #418; Handbook, 17-5, Page ID #364.

On the morning of Hat Day, C.S. arrived at school wearing a black baseball cap that displayed a white star, a white image of an AR-15-style rifle, and the capitalized phrase, "COME AND TAKE IT" ("the Hat"). Leffel Dep., R. 17-4, Page ID #342. C.S. chose to wear the Hat because it belonged to her father and "made [her] feel safe." C.S. Dep., R. 17-10, Page ID #424. At the School, Defendant Michael Papanek, who worked as the "On Track Coach" charged with administering discipline in the school, saw C.S. wearing the Hat and noticed that it depicted a gun. Papanek Dep., R. 15-2, Page ID #250–52. Papanek believed that the Hat may have been a violation of school policy and went to inform the Principal, Defendant Amy Leffel, to discuss what, if anything, should be done about the Hat. Based on Papanek's description of the Hat, Principal Leffel felt that the image of a firearm, combined with the phrase "Come And Take It," had the potential to incite an altercation between young children and disrupt the testing environment, and that some students may find it "threatening." Leffel Dep., R. 17-4, Page ID #342, 344–45.

Specifically, Leffel believed that the Hat could cause a disruption amongst students who had recently transferred to Robert Kerr from the Oxford School District as result of the Oxford Shooting on November 30, 2021, less than three months earlier, during which several students were killed or seriously injured. *See Crumbley*, 11 N.W. 3d at 579. Leffel knew that the students from the Oxford School District "were receiving counseling and social work support to deal with the trauma," after having "several conversations with [the students'] parents." Leffel Dep., R. 17-4, Page ID #344. She thought that the Hat could arouse fear in some of these students and that others "could perceive [the phrase "Come And Take It"] as a dare to try and take the hat off of [C.S.]." *Id.* Leffel also cited more generalized concerns that "[g]uns often

suggest violence," which she thought was inappropriate for an elementary school setting, citing the student handbook and "gun-free zone." *Id.* at Page ID #342. Defendant Craig McCrumb, superintendent of Durand Area Schools, was also present in Leffel's office during these deliberations over C.S.'s Hat.

After discussing their concerns regarding the Hat, Papanek and Leffel decided to call C.S.'s parents and ask them to bring her a substitute hat to wear. C.S.'s father, Adam Stroub, declined to do so. From there, Papanek and Leffel went to C.S.'s classroom, called her into the hallway, and asked her to remove the Hat and put it inside her locker. C.S. complied without issue.[2] In a subsequent email exchange between Leffel and Stroub, Leffel explained that the Hat was inappropriate for school because it depicted a weapon in contravention of the student handbook, and that "[w]eapons of any kind are not appropriate for students to wear in a school setting." Emails, R. 17-12, Page ID #436. The dress code stated in pertinent part: "Anything printed on clothing must not be offensive in any way. The building principal/staff has the right to decide what is offensive, but some examples are: words/slogans that advertise illegal substances, words/slogans that are racially or religiously offensive, violence themes, vulgar or sexual innuendo, etc." Handbook, R. 17-5, Page ID #364. In the email to Stroub, Leffel also referenced the handbook's mission to keep students safe and prevent distractions to "the learning atmosphere of the classroom." Emails, R. 17-12, Page ID #436.

On May 9, 2022, Plaintiff C.S., by her father Stroub, filed a lawsuit against Defendants Papanek, Leffel, and McCrumb ("school officials") under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments, and seeking declaratory and injunctive relief. Plaintiff moved for summary judgment on April 21, 2023, arguing that Defendants violated her First Amendment rights by asking her to remove the Hat, and Defendants filed a response. On April 24, 2023, Defendants filed their motion for summary judgment two days after the motion deadline set by the amended Case Management Order, arguing that the school was authorized to forbid the Hat under the circumstances in the record. Plaintiff moved to strike Defendants'

---

[2]The record does not indicate that C.S. experienced any anger, distress, or other negative emotions in response to school officials' request for her to remove the Hat.

motion as untimely.  The district court denied Plaintiff's motion but cautioned Defendants to ensure their compliance with all future deadlines.

On January 23, 2024, the district court heard oral argument on the parties' cross-motions for summary judgment.  Ultimately, the court denied Plaintiff's motion and granted summary judgment to Defendants.  The court credited Principal Leffel's determination that the Hat was inappropriate for the school setting and risked causing a substantial disruption in school activities.  In evaluating the reasonableness of this determination, the district court stressed that certain factors proved important, such as the presence of students who had transferred to Robert Kerr from the Oxford School District and were undergoing trauma therapy, and the young age of Plaintiff and her third-grade classmates.  This appeal followed.

## II.  DISCUSSION

### A.  Plaintiff's First Amendment Claim

This Court reviews *de novo* the district court's grant of summary judgment to school officials.  *Barr v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008).  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "We view all evidence in the light most favorable to the nonmoving party."  *Barr*, 538 F.3d at 561 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 700 (6th Cir. 2007) (internal quotation marks omitted)).

Plaintiff C.S. argues that she was entitled to wear the "Come and Take It" Hat under *Tinker v. Des Moines Independent Community School District*.  *See* 393 U.S. 503, 506 (1969).  She contends that school officials did not have enough evidence to reasonably forecast that allowing the Hat to be worn in school would cause a "substantial disruption" in school activities under *Tinker*, and therefore lacked the authority to require its removal.  393 U.S. at 514.  Plaintiff characterizes her decision to wear the Hat as political speech aimed at showing personal support

for the Second Amendment.[3]  She also claims that the district court gave improper weight to her young age in declining to protect her expression in wearing the Hat.

Defendants respond to these arguments by citing concerns relating to the student population of Robert Kerr Elementary School, which consisted of children who had transferred from the Oxford School District after the widely publicized Oxford High School Shooting of 2021.  They argue that this special circumstance, combined with "the hat's provocative invitation to 'COME AND TAKE IT,'" led school officials to reasonably forecast a risk of substantial disruption under *Tinker*.  *See* Appellee Br., ECF No. 31, 11–13.  Further, Defendants claim that the district court properly accounted for Plaintiff's young age and the elementary school setting in concluding that her speech was not supported by the First Amendment.  Due to the factors at play, we hold that school officials did not act improperly or in violation of the First Amendment by asking C.S. to remove the Hat.

### 1.  Constitutional Analysis

Central to this dispute is the Supreme Court's landmark ruling in *Tinker*, which protects the First Amendment rights of teachers and students in public school as long as their speech does not threaten to substantially disrupt or interfere with school activities.  *See* 393 U.S. at 506, 514.  In *Tinker*, three students aged thirteen to sixteen were suspended from school for wearing black armbands in protest of the Vietnam War.  393 U.S. at 504.  The Court described the students' symbolic act as "closely akin to 'pure speech'. . . entitled to comprehensive protection under the First Amendment."  *Id.* at 505–06.  Importantly, the Court found "no evidence" that the wearing of the armbands caused any interference whatsoever with school activities or the rights of other students, outside of a few "hostile remarks," and that the school officials were improperly motivated by the desire to avoid controversy.  *Id.* at 508–10 (stressing that the suppression of student speech must be "caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").  Because the school officials in *Tinker* "sought to punish [the students] for a silent, passive expression of opinion"

---

[3]This Court acknowledges Plaintiff C.S.'s "support for the right of people to have guns" as stated in her declaration; however, the record does not indicate that Plaintiff objected to school officials' request to remove the Hat or was otherwise upset by their request.  C.S. Decl., R. 20-1, Page ID #504.

that presented no reasonable threat of "any disorder or disturbance" in school activities, they infringed on the students' constitutional rights. *See id.* at 508.

*Tinker* also made clear that while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," these rights are not absolute. *See* 393 U.S. at 506; *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (noting that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings"). School officials may therefore restrict student speech when the facts reasonably lead them "to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514; *see also Lowery v. Euverard*, 497 F.3d 584, 591–93 (6th Cir. 2007) (clarifying that school officials may intervene preemptively when such facts exist, because "*Tinker* does not require disruption to have actually occurred"). Although the forecasted disruption must be substantial, it need not be violent. *Barr*, 538 F.3d at 566. *Tinker* also allows school officials to regulate speech "as part of a prescribed classroom exercise." 393 U.S. at 513.

Moreover, *Tinker* applies the First Amendment to student speech "in light of the special characteristics of the school environment," which may include such factors as the age and emotional maturity level of schoolchildren viewing the speech, particularly with respect to sensitive topics. 393 U.S. at 506; *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187 (2021) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988)). The Supreme Court's subsequent First Amendment cases inform us that schools may regulate student speech that is: (1) distractingly vulgar or lewd; (2) promotes illegal drug use; or (3) "bear[s] the imprimatur of the school." *See Fraser*, 478 U.S. at 685; *Morse v. Frederick*, 551 U.S. 393, 410 (2007); *Kuhlmeier*, 484 U.S. at 271–73. Because the present matter does not concern vulgar speech or illegal drug use, it is governed by *Kuhlmeier* or *Tinker*. Under *Kuhlmeier*, school officials' actions would likely have been permissible to the extent that Hat Day was considered "part of the school curriculum," but we analyze them instead under *Tinker*'s more speech-protective standard.[4]  484 U.S. at 270–71; *see Barr*, 538 F.3d at 564. Approaching the issue under *Tinker*

---

[4]The Great Kindness Challenge was a school-organized activity, including the dress-up days. R. 17-9, School Newsletter, Page ID #418–19. There is at least a colorable argument that C.S.'s speech "was made as part of school activities" and thus, that *Kuhlmeier*'s more school-friendly standard should apply. *Curry v. Hensiner*, 513 F.3d 570, 577–78 (6th Cir. 2008); *see Mahanoy*, 594 U.S. 187–88. *See n. 7, infra.* But because the Challenge was

means that school officials were authorized to prevent C.S. from wearing the Hat as long as the facts led them to reasonably forecast a "substantial disruption of or material interference with school activities." *See Tinker*, 393 U.S. at 514.

In the present case, this prediction was well-founded. Robert Kerr Elementary School had two key characteristics that Defendant school officials considered in asking Plaintiff to remove her Hat, and that underpin our analysis: first, the presence of transfer students who relocated from the Oxford School District after the Oxford Shooting, and second, the young age and emotional immaturity of elementary students in general. First, and perhaps most significantly, we consider the impact of the Oxford Shooting. Earlier in the 2021–2022 school year, four students were murdered at the Oxford High School in Oakland County, Michigan, by a fifteen-year-old shooter using a semi-automatic handgun. As Defendants note, this was a "well-known event" that spurred nationwide coverage and had a calamitous and long-lasting effect on the state of Michigan.[5] Appellees' Br., ECF No. 31, 11. Although the record below does not provide great detail on the Oxford Shooting or its aftermath, the event was publicized so extensively that the district court did "not . . . ignore [its] reality" in assessing Defendants' argument. Order, R. 25, Page ID #622. On top of the heightened impact of the Oxford Shooting on Michigan as a whole, we also consider its proximate impact on areas in southeast Michigan just miles away from the Oxford School District, and in the months immediately following the attack.

Indeed, the School's relationship to this massacre was both spatial and temporal. *See* Order, R. 25, Page ID #627 (noting that "'temporal factors and recent events' should be considered in evaluating whether school administrators *reasonably* anticipated . . . a substantial

---

not a supervised or required assignment or otherwise part of the curriculum, and the school administrators' contemporaneous justifications focused on disruption, we analyze their actions under *Tinker*. *See Kuhlmeier*, 484 U.S. at 271.

[5]For added context, the district court cited news coverage describing the Oxford Shooting and the criminal prosecution of its perpetrator. Livia Albeck-Ripka & Sophie Kasakove, *What We Know About the Michigan High School Shooting*, N.Y. TIMES (Dec. 9, 2021), https://www.nytimes.com/article/oxford-school-shooting-michigan.html. The district court further noted that "on the day [it] held oral argument in this case, the criminal trial for one of the parents of [Crumbley] commenced." Order, R. 25, Page ID #623. *See* Associated Press, *Michigan School Shooter's Mother to Stand Trial for Manslaughter in 4 Student Deaths*, U.S. NEWS (Jan. 23, 2024, 12:17 AM), https://www.usnews.com/news/best-states/michigan/articles/2024-01-23/michigan-school-shooters-mother-to-stand-trial-for-manslaughter-in-4-student-deaths.

interference" in school activities) (quoting *N.J. v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022)). Located in Durand, Michigan, the School is less than a one-hour drive from Oxford Township, Michigan, where the Oxford Shooting occurred, and four students lost their lives. The shooting also transpired on November 30, 2021, less than three months before "Hat Day" on February 17, 2022, when third-grader C.S. wore the gun-themed Hat to school. Undoubtedly, the record proves that "the Oxford shooting was very close in both time and space." Order, R. 25, Page ID #627. This striking closeness lends context to the School's apprehensions about Plaintiff's Hat disrupting the student environment.

In addition, school officials had the unique challenge of educating and supporting students who fled the Oxford School District after the Oxford Shooting and relocated to Robert Kerr for their emotional and physical safety. Principal Leffel knew that these students were actively "receiving counseling and social work support to deal with the trauma" of the Oxford Shooting. Leffel Dep., R. 17-4, Page ID #344. Leffel also had firsthand knowledge of these students' struggles after engaging in "several conversations with their parents," which informed her belief that Plaintiff's Hat could cause a substantial disruption by compounding the students' existing feelings of fear and distress over school shootings. *See id.* Principal Leffel's testimony about the students' trauma is well-taken, and substantiated by media reports that were pervasive at the time.[6] Surely it was reasonable for Leffel to perceive a risk that Plaintiff's Hat, sporting an image of an AR-15-style weapon, could cause traumatized children to become increasingly fearful about school shootings in a way that might cause a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514.

---

[6]In addition to testimony in the record, several media reports conveyed the trauma and fear experienced by students attending school in the Oxford School District after the 2021 shooting. *See, e.g.*, Koby Levin & Ethan Bakuli, *Oxford High School Shooting Trauma: How Michigan Families Can Get Help*, DETROIT FREE PRESS (Dec. 3, 2021, 11:20 AM), https://www.freep.com/story/news/local/michigan/oakland/2021/12/03/oxford-high-school-shooting-trauma-resources/8851793002/; Keenan Smith, *How to Help Your Kids Deal With Grief, Trauma After the Oxford High School Shooting*, WXYZ DETROIT (Dec. 9, 2021, 6:59 AM), https://www.wxyz.com/news/oxford-school-shooting/how-to-help-your-kids-deal-with-grief-trauma-after-the-oxford-high-school-shooting; Tiarra Braddock, *Mother of Oxford High School Student Shares How Her Family Has Coped With 2021 Shooting*, WXYZ DETROIT (Nov. 30, 2023, 6:09 PM), https://www.wxyz.com/news/oxford-school-shooting/mother-of-oxford-high-school-student-shares-how-her-family-has-coped-with-2021-shooting.

Plaintiff seeks to rely on *Schoenecker v. Koopman*, a decision from the Eastern District of Wisconsin, in arguing that students' generalized fear of gun violence and school shootings is not enough to suppress gun-related speech in schools. 349 F. Supp. 3d 745, 748, 754 (E.D. Wis. 2018). While true in theory, Plaintiff's argument glosses over the sizeable contrast between the facts in *Schoenecker* and those in the instant case. In *Schoenecker*, a high school student from Wisconsin wore T-shirts to school that "made some of the teachers . . . uncomfortable" because of their depiction of weapons stylized to spell out phrases such as "Celebrate Diversity" and "Love." *Id.* at 747–48. The staff members cited students' "general" concerns about experiencing a school shooting, because of the recent school shooting in Parkland, Florida, as well as the fact that some students at the school had "participated in a walkout to protest school gun violence and to remember the 17 victims killed in the Parkland shooting." *Id.* at 753.

The *Schoenecker* court was unpersuaded by these points and found no relationship between the Florida shooting and the Wisconsin student's T-shirts, which did not result in a substantial disruption at the Wisconsin school and could not reasonably be forecasted to do so. *See id.* at 752–54. By contrast, school officials in the present matter relied on their knowledge of Robert Kerr's "special characteristics" and student body in making such a prediction. *Tinker*, 393 U.S. at 506. Specifically, they knew that a group of young students from the Oxford School District had transferred to Robert Kerr because of the Oxford Shooting earlier that academic year and were suffering from trauma. Given the emotional vulnerability and age of the students, the School's decision to require C.S. to remove the Hat for its depiction of an AR-15-style weapon, in anticipation that it could "trigger emotional and fear-based responses" in children, was "reasonably related to the legitimate pedagogical objective of preventing school and classroom disturbances before they occurred."[7] Order, R. 25, Page ID #628.

---

[7]We also recognize *Tinker*'s allowance for speech restrictions "as part of a prescribed classroom exercise," 393 U.S. at 513, and that the School's "Great Kindness Challenge" was meant to promote a "culture of kindness and compassion in [the] school." School Newsletter, R. 17-9, Page ID #419; *see Kuhlmeier*, 484 U.S. at 271. While *Tinker* broadly stands for the speech rights of students in public school, these rights may be limited to "maintain[] the focus of the class on the assignment in question." *Settle v. Dickson Cnty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995).

Clearly, there is a distinction between the generalized fear of school shootings in *Schoenecker* versus the potential for very *particularized* fears in the instant case. At Robert Kerr, school officials did not base their forecast of a substantial disruption on an out-of-state or other remote shooting; they were concerned about inflaming the effects of a recent, local shooting—in Michigan and less than one hour away—that had a direct impact on a portion of the student body. These students were actively undergoing counseling "to deal with the trauma" surrounding the Oxford Shooting, an event that brought death and serious injury to members of their community—while inflicting fear, shock, and sadness onto many others. *See* Leffel Dep., R. 17-4, Page ID #344. These conditions were manifestly more serious than the generalized fears expressed by staff members in *Schoenecker* and thus contributed to the School's reasonable forecast of a substantial disruption. *See* 349 F. Supp. 3d at 753.

*Schoenecker* is further distinguishable because of the language on the student's T-shirts, which displayed arguably tongue-in-cheek phrases such as "Love" and "Celebrate Diversity" spelled out using firearms. 349 F. Supp. 3d at 747–48. These phrases do not have the same provocative tone as Plaintiff's "Come And Take It" Hat, which the School interpreted as "threatening" and "trying to incite someone to come and have an altercation to take the weapon," or even the Hat itself. *See* Leffel Dep., R. 17-4, Page ID #342, 344. This view is understandable given the School's student body, comprised of traumatized and elementary-aged children, who may be more likely to react strongly or "impetuous[ly]" to depictions of AR-15-style weapons. *See id.* at Page ID #344.

Likewise, we also consider the young age of Plaintiff and her classmates in assessing the School's decision to request removal of the Hat, since the dynamics in an elementary school are markedly different from those in a high school. While children mature at different ages, it remains true that the issues sensitive to teenagers are not the same as those sensitive to children under ten years of age. *See Kuhlmeier*, 484 U.S. at 272. For instance, much of the speech on dating or sexuality may be acceptable or even advisable discourse in high school, yet unfit for students under ten years of age. *See id.* Similarly, the existence of Santa Claus or the Tooth Fairy may be a sensitive issue for young children that merits some discretion in an elementary school setting but is largely irrelevant for teenagers. *See id.* School officials may thus account

for the significant emotional and developmental limitations of young students in deciding what speech to permit, insofar as "potentially sensitive topics" are concerned. *Id.* Naturally, student speech centered on guns and other violent themes embodies this category.

We must therefore account for the age and relative emotional immaturity of Plaintiff's classmates. Robert Kerr Elementary is a school for students in the second to the fifth grades, corresponding generally with the ages of seven through ten. As Plaintiff was in the third grade, she and most of her classmates were presumably aged eight, or close to it, which is many years younger than most student plaintiffs in the case law governing student speech. *Tinker* primarily concerned high school students wearing armbands to protest the Vietnam War who, at fifteen and sixteen years of age, were nearly twice the age of eight-year-old C.S. 393 U.S. at 504. The youngest plaintiff in *Tinker*, a thirteen-year-old in junior high, was still considerably older than C.S. and her third-grade classmates. *Id*.

Plaintiff relies on decisions from the Fourth and Seventh Circuits for guidance on gun-related speech in schools, both of which feature students several years older than C.S. *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 252 (4th Cir. 2003) (protecting the speech rights of a twelve-year-old student who wore a T-shirt depicting the acronym "NRA" alongside a graphic of individuals aiming firearms); *Sonnabend*, 37 F.4th at 417, 427 (remanding for further proceedings consistent with *Tinker* when a high-school sophomore wore a T-shirt depicting a handgun); *see also Schoenecker*, 349 F. Supp. 3d at 754 (protecting a high school freshman's right to wear gun-themed shirts). While parts of our analysis might be different had C.S. been in high school or even junior high school, this Court is faced with the reality that C.S. and her classmates were elementary-aged children in the third grade.

Plaintiff correctly notes that elementary students enjoy at least some free speech protections,[8] *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 120 (2001), but the decision to tolerate speech on sensitive matters must be made in light of "the emotional maturity of the

---

[8]We further observe many significant differences between this case and *Good News Club*, which analyzed the speech issue as viewpoint discrimination in a limited public forum, concerned a Christian club seeking to meet at school after school hours, and discussed neither *Tinker* nor disruptions in instruction or regular school activities. 533 U.S. at 102, 105.

intended audience." *Kuhlmeier*, 484 U.S. at 272. Even the Seventh Circuit's decision in *Sonnabend*, cited in Plaintiff's appellate brief, supports this notion: "The application of *Tinker* must account for such factors as the age and grade level of the students to whom the speech is directed and any factors particular to the educational environment or history of the school or student body in question." 37 F.4th at 426 (citation omitted). This is for good reason.

In the present matter, the particularly young age of C.S. and her classmates gives weight to Defendants' prediction that the Hat could cause a substantial disruption in school activities, since "[t]hese students are less mature and capable of [reining] in emotional outbursts than junior high or high schoolers." Order, R. 25, Page ID #628. This concern was intensified by the provocative nature of the Hat's phrase "Come And Take It," which Principal Leffel judged problematic around "young kids who can be very impetuous and could perceive [the phrase] as a dare to try and take the hat off of [C.S.]" *See* Leffel Dep., R. 17-4, Page ID #344. Due to the presence of very young children, coupled with students who were already suffering emotional trauma from the local and very recent Oxford Shooting, Leffel and other school officials reasonably forecasted a risk of substantial disruption when they asked C.S. to remove her Hat. *Id.* at Page ID #344.

Plaintiff's brief on appeal also cites to the design of the Michigan Great Seal and Coat-of-Arms,[9] which shows a man beside a lake "with his right hand raised up and his left hand holding a long gun," all pictured on a dark blue shield. *See* Appellant Br., ECF No. 30, 28. The shield is framed by the more prominent images of an elk, a moose, and a bald eagle, with the Latin word "Tuebor" written across the top, meaning "I Will Defend." *See id.*; STATE SYMBOLS USA, https://statesymbolsusa.org/symbol-official-item/michigan/state-seal/seal-michigan (last visited Mar. 26, 2025). Because the Michigan Coat-of-Arms features a weapon, Plaintiff argues that the School's decision to restrict the AR-15-themed Hat would also proscribe clothing items depicting the state seal and flag. *See* Appellant Br., ECF No. 30, 27–28. Notwithstanding the hypothetical nature of this point, we disagree that such a result follows logically from the

---

[9]Plaintiff cites to an informational page on the Michigan State Seal which defines the Latin phrases on the design and states that "Michigan's Coat of Arms was inspired by the 17th Century coat of arms of the Hudson's Bay Company, one of the earliest and largest fur-trading companies in North America." STATE SYMBOLS USA, https://statesymbolsusa.org/symbol-official-item/michigan/state-seal/seal-michigan (last visited Mar. 26, 2025).

School's decision to restrict the Hat, because other restrictions on student expression would still be subject to *Tinker*'s substantial disruption standard. 393 U.S. at 514. On this point, we note the modest or even ambiguous nature of the long gun on the state seal and flag, and the benign appearance of the man holding it, which unlike Plaintiff's Hat, does not emphasize the gun's presence or tempt anyone to "Come And Take It." *See* Leffel Dep., R. 17-4, Page ID #344.

Plaintiff's comparison also assumes that the modest depiction of a man holding a hunting rifle outdoors, as seen on the state seal and flag, would carry the same risk of a substantial disruption or material interference in school activities as the Hat's prominent display of an AR-15-style weapon. *Tinker*, 393 U.S. at 514. There is a clear difference between these two portrayals, especially in light of the upsurge in school shootings carried out using AR-15-style weapons, and the potential for young children to have an acute response after surviving, witnessing, or otherwise feeling the front-row impact of such tragedy. *See* Leffel Dep., R. 17-4, Page ID #344; *see Staples v. United States*, 511 U.S. 600, 603 (1994) (describing the AR-15 as "the civilian version of the military's M-16 rifle"). Given the Hat's graphic and slogan, school officials made a reasonable forecast of a substantial disruption based on its provocative nature and "picture of an automatic weapon," which both stood to worsen the students' shooting-related trauma. Leffel Dep., R. 17-4, Page ID #344.

As a word of caution, we nowhere suggest that the generalized potential for students' discomfort, offense, or other psychological distress, *without more*, is enough for schools to ban speech on topics such as the Second Amendment. The record must show the existence of facts allowing school officials to reasonably forecast a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. To be sure, "political speech [is] at the core of what the First Amendment is designed to protect," *Virginia v. Black*, 538 U.S. 343, 365 (2003), and courts must be vigilant in safeguarding student expression in schools. But we must also account for the difficult jobs of school administrators and educators in maintaining a school environment that is, above all, conducive to learning for all of its students. Schools are under no obligation to tolerate speech that frustrates this goal or runs the reasonable risk of doing so. *See Tinker*, 393 U.S. at 514. This is especially true when young children engage with

sensitive topics, *Kuhlmeier*, 484 U.S. at 272, and is ever more compelling in the face of children reeling from an irrefutably tragic and traumatic event.

As Defendants acknowledge, this is a fact-driven case. The district court's analysis, as well as our own, "might have been different if the Oxford tragedy had not occurred, if it had not occurred less than an hour's drive from Durand Area Schools, or if students from Oxford had not transferred into the District," as well as "if C.S. was in high school as opposed to third grade." Appellees' Br., ECF No. 31, 12. As it stands, however, these facts support our conclusion that Defendants' actions were readily defensible. The record demonstrates that school officials relied on their knowledge of the student body to make a reasonable forecast of a substantial disruption in school activities, and therefore did not violate the First Amendment by asking C.S. to remove her Hat. *See Tinker*, 393 U.S. at 506.

## 2. Qualified Immunity

Defendant school officials argue that the case against them is precluded by the doctrine of qualified immunity because "no prior case law clearly established that restricting firearm imagery in this context was unconstitutional." Appellees' Br., ECF No. 31, 21. This Court uses a two-prong test to evaluate whether qualified immunity may shield a government official from trial. *Lowery*, 497 F.3d at 587. First, we determine whether the official's conduct violated a constitutional right. *Id*. If the answer is yes, we proceed to determine whether the right was clearly established at the time of the violation. *Id*. We need only resolve "one of the two inquiries" in Defendants' favor to grant them summary judgment. *McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Because school officials acted on the reasonable belief that Plaintiff's Hat could cause a substantial disruption in school activities, their actions did not run afoul of *Tinker* or offend the Constitution as required by the first prong of this test. 393 U.S. at 514. This ends our analysis on qualified immunity, and we need not proceed to the second prong. *McElhaney*, 81 F.4th at 556. Even assuming, for argument's sake, that a constitutional violation occurred, school officials would still be shielded from trial because it was not clearly established in 2022 that students may wear gun or weapon-themed clothing to school, particularly under the novel

circumstances of this case.  In consideration of the above, we affirm the district court's grant of summary judgment to Defendant school officials.

### B.  Defendants' Motion For Summary Judgment

Plaintiff argues that the district court improperly considered Defendants' untimely motion for summary judgment that they submitted on April 24, 2023, two days past the filing deadline of April 22, 2023, as set by the court's scheduling order.  Plaintiff then filed a motion to strike Defendants' motion as untimely, which the district court denied.[10]  In acknowledgement of their own untimeliness, Defendants' attribute the mistake to a misinterpretation of Rule 6(a) read in conjunction with the local rules, explaining that they believed they were permitted to file on April 24, 2023, a Monday, since the original deadline of April 22, 2023, fell on a Saturday.  We affirm the district court's decision to accept and consider Defendants' untimely motion.

"[A] district court's decision to amend its scheduling order to allow a late filing" is reviewed for an abuse of discretion.  *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (noting that a late motion may be properly construed by the district court "as a request to modify the scheduling order").  Similarly, this Court reviews "the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned."  *Collazos-Cruz v. United States*, 117 F.3d 1420, *2 (table) (6th Cir. 1997) (per curiam).  "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or when it employs an erroneous legal standard."  *Andretti*, 426 F.3d at 830 (quoting *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004)).

---

[10]Under Rule 12(f), courts may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Considered a drastic remedy, "[m]otions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015); *see also Oppenheimer v. City of Madeira*, 336 F.R.D. 559, 566 (S.D. Ohio 2020) (noting that there typically "must be evidence that the moving party has been prejudiced" for a motion to strike to be granted).  Plaintiff's motion to strike Defendant's motion for summary judgment, a non-pleading, is not governed by Rule 12(f), and she provides no other procedural basis for her motion; nonetheless, she argues that the district court should have rejected Defendants' motion for being untimely pursuant to this Court's interpretation of Rule 6(a).

"This Court follows the general principle that 'a district court has broad discretion to manage its docket.'" *Franke v. Norfolk S. Ry. Co.*, No. 21-3848, 2023 WL 3413919, at *3 (6th Cir. May 12, 2023) (citing *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 451 (6th Cir. 2010)). After a deadline expires, we may extend it "for good cause . . . if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). This entails an analysis of five factors, including:

> (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith.

*Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).

In the present matter, Plaintiff has not shown that any prejudice resulted from Defendants' two-day delay in submitting their motion for summary judgment, which weighs against rejecting Defendants' motion on that basis. Because the delay was only two weekend days, it can hardly be argued that this slip had any impact on judicial proceedings. *See Varsity Brands, Inc. v. Star Athletica, LLC*, No. 10-2508, 2012 WL 2368436, at *3 (W.D. Tenn. June 21, 2012) (denying a plaintiff's motion to strike in connection with a defendant's late filing because "the length of the delay was just one day," and "had an extremely minimal, if any, impact on th[e] proceedings"); *see also Oppenheimer*, 336 F.R.D. at 566 (noting that "untimeliness alone is not enough to grant a motion to strike an answer").

On appeal, Defendants explain that this oversight was due to a misunderstanding of Rule 6, which caused them to interpret a later deadline than that prescribed by the Case Management Order. While Defendants could have exercised greater diligence in interpreting the rules, we do not find that they acted in bad faith, and the balance of factors tilts in their favor. Additionally, other courts have wielded their discretion to permit untimely summary judgment motions. *See D.B. v. Lafon*, No. 3:06-CV-75, 2007 WL 896135, at *3 (E.D. Tenn. Mar. 22, 2007); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 827744, at *3 (M.D. Tenn. Mar. 3, 2016). Thus, we hold that the district court did not abuse its discretion in denying Plaintiff's motion to strike and proceeding to consider Defendants' untimely motion for summary judgment.

## III.  CONCLUSION

In consideration of Robert Kerr Elementary School's "special characteristics" and circumstances, such as its absorption of students from the Oxford School District and the especially young age of Plaintiff and her classmates, combined with the Hat's provocative message, school officials made a reasonable forecast of substantial disruption to the school's educational environment, *Tinker*, 393 U.S. at 514, and did not violate Plaintiff C.S.'s First Amendment rights by asking her to remove her Hat.  The district court also did not abuse its discretion by considering Defendants' untimely motion for summary judgment.  For the reasons set forth above, we **AFFIRM** the district court's order in full.