RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

B. A., mother of minors D. A. and X. A.,

*Plaintiff*,

D. A. and X. A., minors, by and through their mother, B. A.,

*Plaintiffs-Appellants*,

*v.*

TRI COUNTY AREA SCHOOLS; ANDREW BUIKEMA and WENDY BRADFORD, in their individual capacities,

*Defendants-Appellees*.

No. 24-1769

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-00423—Paul Lewis Maloney, District Judge.

Argued: June 12, 2025

Decided and Filed: October 14, 2025

Before: MOORE, BUSH, and NALBANDIAN, Circuit Judges

───────────────

## COUNSEL

**ARGUED:** Conor T. Fitzpatrick, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Washington, D.C., for Appellants. Annabel F. Shea, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees. **ON BRIEF:** Conor T. Fitzpatrick, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Detroit, Michigan, Sara E. Berinhout, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Philadelphia, Pennsylvania, for Appellants. Annabel F. Shea, Timothy J. Mullins, Kenneth B. Chapie, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees. Krista L. Baughman, DHILLON LAW GROUP INC., San Francisco, California, Ilya Shapiro, Tim Rosenberger, MANHATTAN INSTITUTE, New York, New York, Robert Alt, Bradley A.

Smith, David C. Tryon, Alex M. Certo, J. Simon Peter Mizner, THE BUCKEYE INSTITUTE, Columbus, Ohio, M.E. Buck Dougherty III, LIBERTY JUSTICE CENTER, Austin, Texas, Derek L. Shaffer, QUINN EMANUEL URQUHART & SULLIVAN, Washington, D.C., Matthew Kudzin, COVINGTON & BURLING LLP, Washington, D.C., J. Michael Connolly, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, Michael J. Grygiel, CORNELL UNIVERSITY, Ithaca, New York, Daniel Feinberg, MICHIGAN ASSOCIATION OF SCHOOL BOARDS, Lansing, Michigan, for Amici Curiae.

NALBANDIAN, J., delivered the opinion of the court in which MOORE, J., concurred. BUSH, J. (pp. 19–40), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

NALBANDIAN, Circuit Judge.  Two middle schoolers in Michigan wore sweatshirts emblazoned with the phrase "Let's Go Brandon" to school.  Based on the commonly understood meaning of the slogan, the school administrators determined that the sweatshirts were inappropriate for the school environment.  They asked the students to remove the sweatshirts, and fearing punishment, the students complied.  But they still wanted to wear the sweatshirts at school to express their disapproval of then-President Joe Biden's administration and its policies.  So, through their mother, the students sued the school district and several school administrators, alleging that the school deprived them of their First Amendment rights.  The district court sided with the school district, concluding that the school could reasonably prohibit the sweatshirts since they were vulgar speech.  Because the school reasonably understood the slogan "Let's Go Brandon" to be vulgar, we affirm.

## I.

On October 2, 2021, Brandon Brown, a professional racecar driver, scored his first major win at the Sparks 300, a NASCAR Xfinity Series race, at the Talladega Superspeedway in Alabama.  But it was what happened afterward that propelled his name into the national consciousness.  During a post-race interview with Brandon, the crowd began to audibly chant the phrase "Fuck Joe Biden."  As the chant increased in volume, NBC Sports reporter Kelli Stavast interjected on live TV: "You can hear the chants from the crowd, 'Let's Go Brandon.'"  While it is unclear whether Stavast had misheard the crowd or whether she was simply trying to put a fig

leaf over the chant's vulgarity, the damage was done.  The clear disconnect between what the crowd was chanting and what Stavast had claimed caused the clip and its audio to proliferate.  The phrase "Let's Go Brandon" became, for lack of a better term, a meme.

From the beginning, the expression had a wide range of meanings.  Some saw it as merely a euphemism for what the crowd really said.  Others used it as a shibboleth to express antipathy towards the then-President and his policies.  And still others used it to question what they perceived as liberal bias in the media—based on the theory that NBC had been trying to hide the anti-Biden sentiment on display at Talladega.  In any event, the phrase "Let's Go Brandon" quickly entered common usage, appearing in broadcast television, the Congressional record, and even President Biden's NORAD Santa tracker call-in on C-SPAN.  And the phrase continued to evolve.  Some of Biden's supporters adapted the phrase to make the "Dark Brandon" meme, which depicted the then-President as a preternaturally powerful leader with eyes of glowing flame.  Indeed, President Biden himself shared one of these memes on social media to poke fun at online conspiracy theories that he'd orchestrated the Kansas City Chiefs' Super Bowl win to have prominent Chiefs fan Taylor Swift endorse him in the 2024 election.

With the phrase "Let's Go Brandon" so firmly established in the national lexicon, its addition to shirts, sweatshirts, and flags was inevitable.  Which brings us to the events underlying this suit.

In December 2021, brothers D.A. and X.A. each received a "Let's Go Brandon" sweatshirt from their mother for Christmas.  At that time, both children attended Tri County Middle School in Howard City, Michigan—D.A. as a sixth grader and X.A. as an eighth grader.  And both were aware of the expression's provenance.  Still, D.A. chose to wear his "Let's Go Brandon" sweatshirt to school in February 2022.  Andrew Buikema, the assistant principal of Tri County Middle School, stopped D.A. in the hallway and asked him to remove the sweatshirt since the phrase "means the F-word."  R.38-4, Buikema Dep., p.67, PageID 433.  Because D.A. was also wearing a "Let's Go Brandon" t-shirt underneath the sweatshirt, Buikema instructed D.A. to remove both and change into school-provided clothing.  And D.A. obliged.

But only a few weeks later, D.A. again wore his "Let's Go Brandon" sweatshirt to school. This time, Wendy Bradford, a teacher, confronted him and said: "[Y]ou might want to take that off, otherwise Mr. Buikema is right down the hallway, you can talk to him." R.38-5, Bradford Dep., p.34, PageID 446. Fearing punishment, D.A. again complied by removing the sweatshirt for the rest of the school day. And yet in May 2022, X.A. followed in his brother's footsteps by wearing his own "Let's Go Brandon" sweatshirt to school. Buikema called him to the front office and told him to remove the sweatshirt because the slogan had a "profane double meaning" and so was in violation of the school's dress code. R.38-4, Buikema Dep., p.66, PageID 433. X.A. complied with Buikema's request and the brothers were not involved with any further violations of the dress code. Though a third student was also asked to remove a "Let's Go Brandon" sweatshirt in 2022.

At the time of these incidents, the Tri County Middle School dress code noted that "[s]tudents and parents have the right to determine a student's dress, except when the school administration determines a student's dress is in conflict with state policy." R.39-10, 2022-23 TCMS Student Handbook, p.24, PageID 644. The code specifically prohibited any "[a]ttire with messages or illustrations that are lewd, indecent, vulgar, or profane, or that advertise any product or service not permitted by law to minors." *Id.* And any staff member has the power to enforce the requirements of the dress code.

Buikema testified that the dress code didn't prevent the students from wearing clothing that expressed political statements so long as it didn't violate the dress code. For example, both X.A. and D.A. themselves testified that they had seen some of their peers wearing "Make America Great Again" (MAGA) apparel as well as other clothing endorsing President Donald Trump. In a similar vein, Bradford testified that she had seen students wearing clothing supporting candidates from both political parties. And the school's principal, Joseph Williams, emphasized in his deposition that students could—and often did—wear clothing with political messages without violating the dress code.

Clothing didn't need to be disruptive to violate the dress code. Indeed, Principal Williams testified that he was not aware that the school had experienced any disruption from

students wearing "Let's Go Brandon" apparel.  And yet both Williams and Buikema stated that sweatshirts and other clothing bearing the expression could be banned because it was vulgar.

In May 2022, the plaintiffs, through counsel, sent the district a cease-and-desist letter, outlining their view that the ban on wearing the "Let's Go Brandon" sweatshirts had violated D.A. and X.A.'s First Amendment rights.  The district rejected the demands, noting that the commonly understood meaning of "Let's Go Brandon" was profane or vulgar and that the school dress code allowed administrators to prevent students from wearing clothing with profanity or vulgarity.

So in April 2023, the plaintiffs filed this lawsuit, asserting claims against the school district as well as against Buikema and Bradford in their individual capacities.  Their complaint asserted five causes of action.  The first two claims alleged deprivations of the brothers' First Amendment rights by Buikema and Bradford under 42 U.S.C. § 1983 and by the school district under a *Monell* theory.  The last three sought injunctive and declaratory relief against the various parties to stop the school's infringement of First Amendment rights and because the dress code was unconstitutionally vague and overbroad.  After discovery, the parties each moved for summary judgment.  In their summary judgment briefing, the plaintiffs noted that later changes to the dress code had mooted the vagueness and overbreadth claims.

The district court granted the defendants' motion, concluding that the school administrators had not deprived the plaintiffs of any constitutional right.  The court noted that because "schools can prohibit students from wearing apparel that contains profanity, schools can also prohibit students from wearing apparel that can reasonably be interpreted as profane." *D.A. ex rel. B.A. v. Tri Cnty. Area Schs.*, 746 F. Supp. 3d 447, 460 (W.D. Mich. 2024).  So the court held that because the administrators "reasonably interpreted the phrase as having a profane meaning, the School District can regulate [the] wearing of Let's Go Brandon apparel during school without showing interference or disruption." *Id.* at 461.  This determination that there was no underlying constitutional violation meant that the plaintiffs' three remaining claims failed.  And the district court entered judgment for the defendants dismissing all the plaintiffs' claims with prejudice.  The plaintiffs appealed.

## II.

We review the district court's grant of summary judgment de novo. *Capen v. Saginaw County*, 103 F.4th 457, 461 (6th Cir. 2024). Summary judgment is proper only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Our Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. And this limitation also binds state and local governments through the Fourteenth Amendment. *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025). Public schools, "like all government institutions," may not ignore the strictures of the First Amendment. *See Mahmoud v. Taylor*, 145 S. Ct. 2332, 2350 (2025). So, as "a general matter," the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Paxton*, 145 S. Ct. at 2302 (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). But still, "not all speech is protected." *Id.* And a school's "special characteristics" give it "additional license to regulate student speech." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188 (2021).

Of course, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But those retained rights "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Under *Tinker*, schools can generally forbid or punish student speech that causes a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. But the Supreme Court has recognized several exceptions to *Tinker*'s standard. On school grounds, a school may generally prohibit (1) indecent, lewd, and vulgar speech; (2) speech that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school. *Mahanoy*, 594 U.S. at 187–88 (2021). Without one of these exceptions, the *Tinker* standard applies and the school has the burden of showing that it reasonably believes its regulation of student speech will prevent substantial and material interference with school functions. *Barr v. Lafon*, 538 F.3d 554, 564 (6th Cir. 2008).

This case is about the vulgarity exception.  And specifically, how a school may regulate political speech without vulgar words that the school nonetheless reasonably understands as having a vulgar message.  To answer that, we must resolve two preliminary questions.  The first is linguistic, asking whether a phrase that lacks explicitly profane words might still have a vulgar meaning.  The second is doctrinal, asking whether a school administrator may prohibit student political speech that has a vulgar message.  The district court answered yes to both and so held that the plaintiffs hadn't suffered any constitutional deprivation because the school administrators' actions comported with the First Amendment.  For the reasons given below, we agree.

**A.**

The question of what is vulgar or profane can depend on the individual.  To paraphrase the late George Carlin, everybody has a list of words that they consider profane—but the contents of that list vary greatly from person to person.  In answering whether a jacket emblazoned with the words "Fuck the Draft" deserved constitutional protection, the Supreme Court noted that it's "often true that one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971).  So this high degree of subjectivity means that what is profane often hinges on who decides.  And in related contexts, the Supreme Court has said that the question of who decides should be evaluated in a manner "consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

The Constitution doesn't hamstring school administrators when they are trying to limit profanity and vulgarity in the classroom during school hours.  Again, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.  But neither are school administrators powerless to prevent student speech that the administrators reasonably understand to be profane or vulgar. *Fraser*, 478 U.S. at 683.  And so "the First Amendment gives a . . . student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Id.* at 682 (quoting *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J. concurring in the result)).  Schools are charged with

teaching students the "fundamental values necessary to the maintenance of a democratic political system." *Id.* at 681 (quoting *Ambach v. Norwick*, 441 U.S. 68, 77 (1979)). And avoiding "vulgar and offensive terms in public discourse" is one such value. *Id.* at 683. After all, "[e]ven the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences." *Id.* at 681.

The plaintiffs and their amici respond that the slogan "Let's Go Brandon" is not profane. They emphasize that the phrase is "a purposely non-profane substitute expression, often called a euphemism."[1]  Appellant Br. at 27. Citing scholar Melissa Mohr's work on the history of swearing, the plaintiffs insist that the use of euphemism "'is the opposite of swearing'" because it allows the speaker to "discuss sensitive topics while staying inside cultural norms for polite conversation." *Id.* at 27–28 (quoting Melissa Mohr, *Holy Sh\*t: A Brief History of Swearing* 197 (2013)). And both the plaintiffs and their amici can point to several historical examples of euphemism or other avoidance language being employed to disguise a vulgar or profane word— some of which are as old as this nation.[2] So they use this history to argue that a euphemism cannot be "reasonably interpreted" as profane. *Id.* at 29 (internal quotation marks omitted). Indeed, they argue that prying too closely into what a student meant when he used a euphemism runs the risk of "policing *thought*, not expression" and so punishes students "based not on words used, but words imagined." *Id.* at 30–31.

This argument is correct on the fact that a euphemism is not the same as the explicitly vulgar or profane word it replaces. "Heck" is not literally the same word as "Hell." But the

---

[1]The amicus brief of the Linguistic Scholars articulates a tripartite division of what they call self-censoring. The first are euphemisms, which use "deliberately indirect, conventionally imprecise, or socially 'comfortable' ways of referring to taboo, embarrassing, or unpleasant topics" (for example, "the bad place" instead of "Hell"). Amicus Br. of Linguistic Scholars at 9 (internal quotation marks omitted). The second category consists of minced oaths, which are "a specific type of euphemism whereby the offending term or taboo phrase is distorted or 'minced' so that it no longer offends" ("Heck" instead of "Hell"). *Id.* at 10 (internal quotation marks omitted). And third are sanitized expressions, which use symbols to distort a profane or vulgar word ("H\*ll" instead of "Hell"). *Id.* at 11. As noted by the plaintiffs, "Let's Go Brandon" could be interpreted as either a euphemism or a form of minced oath. For simplicity's sake, and because it does not alter our analysis, we refer to "Let's Go Brandon" as a euphemism.

[2]For example, Mohr points to St. George Tucker, the renowned Virginian jurist and editor of the first American edition of Blackstone's *Commentaries*, who around 1790 wrote a poem with the lines "'G— d— your books!' the testy father said, / 'I'd not give — for all you've read.'" Melissa Mohr, *Holy Sh\*t* 215–16 (2013). While the meaning behind the first two blanks is self-evident, scholars believe that "the third — is replacing 'a fuck,' producing the first recorded example of the modern teenage mantra, 'I don't give a fuck.'" *Id.* at 216.

word's communicative content is the same even if the speaker takes some steps to obscure the offensive word.  The plaintiffs concede that a school could prohibit students from saying "Fuck Joe Biden" because "[k]ids can't say 'fuck' at school."  *Id.* at 20.  And yet they insist that the euphemism "Let's Go Brandon" is distinct—even though many people understand that slogan to mean "Fuck Joe Biden."  So it's not clear that the school administrators acted unreasonably in determining that the euphemism still conveyed that vulgar message.

After all, *Fraser*—the first case that recognized the vulgarity exception—involved a school assembly speech that had a rather elaborate sexual metaphor instead of explicitly vulgar or obscene words.[3]  And yet the Supreme Court had no reservation in holding that the school was not required to tolerate "lewd, indecent, or offensive speech and conduct."  *Fraser*, 478 U.S. at 683.  And it was up to the school to determine "what manner of speech in the classroom or in school assembly is inappropriate."  *Id.*  Because "[t]he pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students—indeed to any mature person," the school could discipline his speech despite the absence of explicitly obscene or vulgar words. And so *Fraser* demonstrates that a school may regulate speech that conveys an obscene or vulgar message even when the words used are not themselves obscene or vulgar.

This conclusion fits with our circuit precedent, which reads *Fraser* to leave it to the school to decide what is vulgar or profane so long as the decision is not unreasonable.  *See Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470 (6th Cir. 2000).  In *Boroff* this court showed the extent of this deference by holding that a school could ban a student's Marilyn Manson shirts as "vulgar, offensive, and contrary to the educational mission of the school."

---

[3]The entire speech that Matthew Fraser gave to the high school assembly is as follows:

I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm.

Jeff Kuhlman is a man who takes his point and pounds it in.  If necessary, he'll take an issue and nail it to the wall.  He doesn't attack things in spurts—he drives hard, pushing and pushing until finally—he succeeds.

Jeff is a man who will go to the very end—even the climax for each and every one of you.
So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can be.

*Fraser*, 478 U.S. at 687 (Brennan, J., concurring in the judgment).

220 F.3d at 471.  And so *Boroff* shows that schools have significant latitude to find that speech is vulgar—even when there are other plausible interpretations of the same speech.

To resist this conclusion, the plaintiffs argue that *Boroff* has been rendered a "dead letter" by the Supreme Court's decision in *Morse v. Frederick*, 551 U.S. 393 (2007).  Appellant Br. at 37 n.18 (citing *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 316 (3d Cir. 2013) (en banc)).  Although we are mindful of what the en banc Third Circuit said, to our knowledge, no panel of the Sixth Circuit has recognized *Boroff*'s abrogation.  And so it's not clear that *Boroff* is so inconsistent with intervening Supreme Court caselaw as to require modification.  The defendants and their amici emphasize that *Boroff* is still good law.  But at times they stretch *Boroff*'s holding beyond what the decision can bear.  In essence, they claim that in *Boroff* "the Sixth Circuit altered *Fraser* to no longer be about whether a school may regulate vulgar language, but instead to be about whether the language is political or not."  Amicus Br. of Mich. Ass'n of Sch. Bds. at 8.  That interpretation seems to simultaneously read *Boroff* too broadly and *Fraser* too narrowly.  After all, *Fraser* was not just concerned with regulation of vulgar words but the regulation of vulgar speech.  That distinction is crucial.  Though the double entendre in Matthew Fraser's speech was obviously vulgar, he didn't use any explicitly vulgar words.  And so *Fraser* focuses on the discretion that school administrators have to regulate speech that is *reasonably understood* as vulgar.

*Boroff* is best understood as simply reaffirming *Fraser*'s core holding that determinations of what is impermissibly vulgar, lewd, indecent, or plainly offensive should be left in the hands of teachers, school administrators, and the popularly elected school board.  As this court has noted elsewhere, this discretion is not limitless—especially not when considering "plainly offensive speech" because "much political and religious speech might be perceived as offensive to some."  *Barr*, 538 F.3d at 564 n.5 (quoting *Morse*, 551 U.S. at 409)).  And so courts should be wary of unreasonable definitions of vulgarity, lewdness, indecency, or offensiveness that seem designed to misuse *Fraser* to engage in viewpoint discrimination.

But in the mine run of cases, federal courts should view a school administrator's reasonable and good-faith determinations of what is vulgar with some deference.  Doing so ensures that unelected federal judges do not supplant democratically elected school boards as the

arbiters of what is or is not appropriate for a student to say while at school.  Although the judiciary has an important role to play in protecting individual freedoms, judges must be careful to not run roughshod over democratically elected officials when the conflict is avoidable.  So where, as here, we conclude that the school didn't violate the First Amendment, "we leave questions regarding its policy to the people, their elected representatives, and the democratic process." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025).

This deferential approach, at least with regard to the type of speech covered by *Fraser*, is consistent with the history of how free speech rights were understood at the time of the Fourteenth Amendment's ratification.  At common law, a father could "delegate part of his parental authority . . . to the tutor or schoolmaster, of his child; who is then *in loco parentis* and has such a portion of the power of the parent committed to his charge, . . . that of restraint and correction, as may be necessary to answer the purposes for which he is employed."  2 William Blackstone, *Commentaries on the Laws of England* 453 (St. George Tucker ed. 1803).  And later American commentators largely accepted this view of the doctrine.  *See* 2 James Kent, *Commentaries on American Law* 170 (1827) (noting that parental authority "may be delegated to a tutor or instructor, the better to accomplish the purposes of education"); Finley Burke, *A Treatise on the Law of Public Schools* 90 (1880) (noting that a teacher generally "has authority, as *in loco parentis*, to enforce . . . civil deportment, respect for the rights of other pupils, and all obligations inherent in every school system").  So the doctrine of *in loco parentis* afforded a good deal of deference to schoolteachers when they acted in a parent's place.

While the Supreme Court doesn't incorporate this common-law doctrine wholesale, it has looked to it for guidance on the interaction between free speech and public schools.[4]  *See Mahanoy*, 594 U.S. at 187 (citing *Fraser*, 478 U.S. at 684).  So reviewing its role in early American history helps show that the original understanding of the First and Fourteenth

---

[4]While *in loco parentis* was a sound basis for a teacher's authority at the time of the Fourteenth Amendment's ratification, the Supreme Court "has recognized that 'the concept of parental delegation' as a source of school authority is not entirely 'consonant with compulsory education laws.'"  *New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985) (quoting *Ingraham v. Wright*, 430 U.S. 651, 662 (1977)); *see also Morse*, 551 U.S. at 424 (Alito, J., concurring) ("It is therefore wrong to treat public school officials, for purposes relevant to the First Amendment, as if they were private, nongovernmental actors standing *in loco parentis*.").  So even though the historical understanding of *in loco parentis* may help us articulate why deference to school administrators is consistent with the original meaning of the Constitution, it is not binding as a matter of law and informative only to a degree.

Amendments did not limit a teacher's ability to curtail vulgar or offensive speech in the classroom. For example, in the 1874 case of *Peck v. Smith*, the Connecticut Supreme Court held that a member of the district school committee could discipline a student when "the language in which he indulged was grossly profane." 41 Conn. 442, 446 (1874). When asked to stop swearing by the committee member, the student had replied that "he would not for him or for any G–d d——n man," leading to his forcible ejection from the school building. *Id.* at 444. The student then sued the committee member for assault and battery and, after losing at trial, the student sought a new trial. *Id.* The state high court affirmed because "the force used against the plaintiff [wa]s fully justified" due to his profanity. *Id.* at 447. This holding suggests that at the time of the Fourteenth Amendment's ratification, a student's right to free speech didn't immunize them from punishment for vulgarity.

That is not to deny that the modern "educational picture is quite different" than what existed in Connecticut at that time. *Mahanoy*, 141 S. Ct. at 2051 (Alito, J., concurring). Even so there are some points of commonality that make a comparison useful.[5] Without reading too much into century-old caselaw, we can deduce that at the time of the Fourteenth Amendment's ratification, a teacher's regulation of vulgar or profane language was not viewed as violating the freedom of speech guaranteed by the state constitutions. *See Deskins v. Gose*, 85 Mo. 485, 486 (1885) (punishing a student for using "profane language"); *Bd. of Educ. v. Helston*, 32 Ill. App. 300, 304 (Ill. Ct. App. 1890) (punishing a student for covering up classmate's obscene graffiti); *cf. Lander v. Seaver*, 32 Vt. 114, 115, 120 (1859) (punishing a student for yelling insults at a teacher). Additionally, the doctrine of *in loco parentis* was understood to give the teacher great latitude in regulating vulgarity or profane speech, notwithstanding the shift from a system of voluntary private schools to one of compelled public schooling. *See Peck*, 41 Conn. at 446–47. And so the history supports a deferential approach.

---

[5]When *Peck* was decided, Connecticut had recently passed a statute making public school attendance compulsory for all children between ages eight and fourteen. 1872 Conn. Pub. Acts 43. And though this decision occurred more than a half-century before incorporation of the First Amendment began to be recognized in *Gitlow v. New York*, 268 U.S. 652 (1925), Connecticut's constitution at the time included a free speech protection analogous to the First Amendment. Conn. Const. of 1818, art I, § 6 ("No law shall ever be passed to curtail or restrain the liberty of speech or of the press.").

With this history in mind, we turn back to the question of who decides what is vulgar. Precedent is clear; *Fraser* puts a thumb on the scale in favor of the school administrators. And here the uncontroverted origin of the slogan shows a plainly vulgar meaning. And so it was reasonable for Buikema and the other administrators to classify the phrase as vulgar based on its association with a vulgar expression. *Fraser* is not so limited that administrators can ban only George Carlin's list of seven words you can't say on television. *Cf. FCC v. Pacifica Found.*, 438 U.S. 726, 751 (1978). Vulgarity and profanity are ever shifting marks.[6] Swearwords that would have curled a prudish Victorian's hair in 1890 have lost their potency in the intervening decades. And new slang terms have taken their place. So the rule governing student speech in the classroom must afford teachers and administrators some deference in determining whether certain speech is vulgar. A needlessly restrictive rule is unsupported by our history or caselaw and would hobble school administration as it looks to ensure a safe and appropriate learning environment.

**B.**

Having decided that the administrators reasonably understood "Let's Go Brandon" as profane, we must now address the question of whether this slogan's political valence affords it greater protection than nonpolitical vulgarity. It is almost a truism that political speech is "at the core of what the First Amendment is designed to protect." *Morse*, 551 U.S. at 403 (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality)). The First Amendment's protections reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Because "speech concerning public affairs is . . . the essence of self-government," it "is entitled to special protection." *Id.* (first quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964); and then quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). So the government normally bears a high burden when attempting to prohibit political speech or limit debate on issues of public importance.

---

[6]*See Fraser*, 478 U.S. at 691 (Stevens, J., dissenting) ("'Frankly my dear, I don't give a damn.' When I was a high school student, the use of those words in a public forum shocked the Nation. Today Clark Gable's four-letter expletive is less offensive that it was then.").

And as the Supreme Court has long recognized, our nation's schools are charged with "educating the young for citizenship." *Tinker*, 393 U.S. at 507 (quoting *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). Given that active participation in the political process is one of our most treasured national values, students must retain their rights to political expression to teach them not "to discount important principles of our government as mere platitudes." *Id.* So students retain the right to engage in political speech in a nondisruptive manner. *Id.* at 514. And yet that right is not unlimited, especially in school—a familiar refrain in these cases. *See Fraser*, 478 U.S. at 682. Which raises the question of what a court should do when the prohibited speech is both vulgar and political.

*Fraser* answers this question by holding that vulgarity trumps the political aspect of speech at school.[7] The Court emphasized "that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point" doesn't imply that "the same latitude must be permitted to children in a public school." 478 U.S. at 682. So a public school may "prohibit the use of vulgar and offensive terms" by students even when those terms are being used to make a political point or comment on a matter of public concern. *Id.* at 683. This is because a student's right to speak freely must be calibrated and "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506. How can a school create an environment conducive to learning if it is compelled to tolerate "lewd, indecent, or offensive speech and conduct" at the whim of its students? *Fraser*, 478 U.S. at 683. And a key function of schools is teaching students values such as civility, which are "essential to a democratic society." *Id.* at 681. The essence of this holding doesn't change just because the vulgar speech also has a political message.

After all, Matthew Fraser was delivering a nomination speech in support of a fellow student's candidacy for school vice president—a quintessentially political act, though one with relatively low stakes. *Id.* at 677. The plaintiffs try characterizing Fraser's speech as a "non-

---

[7]This is, of course, broadly consistent with *Cohen*. After all, the limitations on speech can be tied to the boundaries of a school as "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases." *Cohen*, 403 U.S. at 19. So even if "Let's Go Brandon" is "otherwise permissible speech," a school may still prohibit students from engaging in such speech during school hours on school grounds. *Id.*

political student council assembly speech." Appellant Br. at 33. But this view is hard to square with how the Court described the incident. To start, the Court noted that Fraser "delivered a speech nominating a fellow student for student elective office." *Fraser*, 478 U.S. at 677. Indeed, the Court emphasized that this "assembly was part of a school-sponsored educational program in self-government." *Id.* And Fraser's speech achieved the desired political goal—his candidate won over ninety percent of the vote.[8] So the speech was both political and vulgar— like Cohen's jacket. *Id.* at 682.

Resisting this conclusion, the plaintiffs argue that in Fraser "the student's speech was unrelated to any political viewpoint." Appellant Br. at 32. And from this they determine that Fraser's address couldn't be political speech. But this misunderstands the opinion by cutting off the first half of this quote. The Court did note that "the *penalties* imposed in [Fraser's] case were unrelated to any political viewpoint." *Fraser*, 478 U.S. at 685 (emphasis added). But that doesn't imply that his address wasn't political speech. Instead, it merely confirms that, in regulating Fraser's political speech, the school administrators didn't engage in impermissible viewpoint discrimination based on the political views expressed. This is how *Fraser* differs from *Tinker*. In *Tinker*, the school's punishments were tied to the *political content* of the speech. 393 U.S. at 508. And yet in *Fraser*, the sanctions imposed by the school were linked to the *vulgar content* of the speech—notwithstanding its political nature. 478 U.S. at 680.

So while the Court in *Fraser* did distinguish "between the political 'message' of the armbands in *Tinker* and the sexual content of [Fraser's] speech," that doesn't mean that it discounted the political nature of that speech. *Id.* Indeed, much of the Court's opinion is spent explaining why the speech's vulgarity allowed the school to punish Fraser despite the protections for student political speech. The Court's reference to "Cohen's jacket," shows that when student speech is both vulgar and political, the school's interest in prohibiting vulgarity predominates

---

[8]Jeff Kuhlman, the student for whom Fraser had stumped, won the vice presidency "with some 90 percent of the vote" indicating that Fraser's puerile and "controversial speech was electorally effective." Justin Driver, *The Schoolhouse Gate* 93 (2019).

over the student's interest in making a political statement in the language of their choosing.[9]  *Id.* at 682.

As a fallback, the plaintiffs argue that even if *Fraser* would allow a school to ban political speech that is reasonably understood as vulgar, that holding has been modified by subsequent caselaw.  To support this conclusion, they point to *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, where the Third Circuit, in a sharply contested en banc decision, held that *Morse* had altered the framework set forth by *Fraser*.  725 F.3d 293, 316–17 (3d Cir. 2013) (en banc).  In short, that court held that a school could not "categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning and could plausibly interpret as commenting on a social or political issue."  *Id.* at 320.  And yet this approach doesn't come from the holding of *Fraser* itself.  Instead, the Third Circuit's creation of a quasi-protected category of ambiguously vulgar student speech stems from Justice Alito's concurrence in *Morse*, which it understood as narrowing the holding in *Fraser*.  But there are two problems with that reading.

First, the Third Circuit's conclusion that Justice Alito's concurrence in *Morse* constitutes the controlling opinion relies on a questionable application of the rule set forth in *Marks v. United States*, 430 U.S. 188 (1977).  In *Marks*, the Supreme Court clarified that the holding of a case in which there was no majority opinion "may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds."  *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).  But that was not the situation presented by *Morse* since Justices Alito and Kennedy joined Chief Justice Roberts's majority rather than merely concurring in the judgment.  That's not to deny that

---

[9]Some might argue—notwithstanding the Court's statements to the contrary—that *Fraser* shouldn't be understood as addressing political speech.  After all,  the political issue was a student government election rather than something weightier like a protest of the Vietnam War.  But this would toe the line of inviting courts to apply different standards to political speech based on that speech's connection to "real" electoral politics.  The protection for political speech doesn't hinge on the "judicial determination that particular speech is useful to the democratic process."  *McCutcheon v. FEC*, 572 U.S. 185, 206 (2014) (plurality).  So we are hesitant to recast *Fraser* as holding that student speech on student government is not political for the purposes of the First Amendment.  The better view is that Fraser's rule for vulgar speech applies equally to all student political speech—regardless of its content or subject.  A student can no more wear Cohen's profanity-laced jacket protesting military conscription than he can deliver Fraser's double-entendre laden speech promoting a candidate for school vice president.  *Fraser*, 478 U.S. at 682.  Both are political.  Both are reasonably understood as vulgar.  And both can be prohibited at school.

Justice Alito prefaced his separate concurrence with a statement that he joined the majority "on the understanding that . . . it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422 (Alito, J., concurring). But at most that disclaimer would only serve to limit the extent of the Court's holding in *Morse*. It would not convert Justice Alito's concurrence into a binding majority opinion that could limit and modify the Court's earlier holding in *Fraser*. Holding otherwise would allow the concurrence to "co-opt an opinion" by binding three justices to a separate concurring opinion that they did not join. *See B.H.*, 725 F.3d at 327 (Hardiman, J., dissenting). This is not the proper application of the *Marks* rule. Which is why a majority of the circuit courts, including this one, agree that Chief Justice Roberts's majority opinion in *Morse* is controlling.[10]

Second, even if we assumed that Justice Alito's concurrence was the controlling opinion, it's not clear that it should be viewed as modifying *Fraser*. As noted by Judge Hardiman's dissent, the exceptions to *Tinker*'s requirements created by *Morse* and *Fraser* are distinct from one another. *See B.H.*, 725 F.3d at 330–31 (Hardiman, J., dissenting). *Fraser* dealt with the power of school administrators to categorically prohibit speech that is vulgar, profane, or extremely offensive. 478 U.S. at 685–86. In contrast, *Morse* involved a school administrator's more limited power to prohibit speech advocating illegal drug use. *See* 551 U.S. at 403; *id.* at 422 (Alito, J., concurring).

But in using Justice Alito's *Morse* concurrence to create a new protected category of ambiguously vulgar political speech, the Third Circuit ignored these distinctions. This, in turn, has led to a confusing cross-pollination between two distinct lines of cases. It is not obvious from the cases that the interest that a school has in preventing vulgar or obscene speech is the

---

[10]*Compare Defoe ex. rel. Defoe v. Spiva*, 625 F.3d 324, 332–33 (6th Cir. 2010) (treating Chief Justice Roberts's majority as the controlling opinion), *and Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (same), *and Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013) (same), *and Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011) (same), *and D.J.M ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 761 (8th Cir. 2011) (same), *and Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1228 (10th Cir. 2009) (noting Justice Alito's concurrence but treating Chief Justice Roberts's majority as controlling), *and Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 948 (11th Cir. 2007) (treating Chief Justice Roberts's majority as the controlling opinion), *with Morgan v. Swanson*, 659 F.3d 359, 374 n.46 (5th Cir. 2011) (en banc) (noting that the Fifth Circuit treats Justice Alito's concurrence as the controlling opinion).

same as it has in preventing speech that advocates illegal drug use. *B.H.*, 725 F.3d at 330 (Hardiman, J., dissenting) ("In addition to overriding the careful steps taken to allow schools to regulate student speech since *Tinker*, the Majority errs by placing *Morse* at the center of a case that has nothing whatsoever to do with illegal drug use."). And so it is not clear how *Morse* would limit *Fraser*, especially when nothing in either the majority opinion or Alito's concurrence purported to do so. Put differently, Justice Alito's statement that *Morse* "provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue" doesn't purport to limit *Fraser*'s holding. *See Morse*, 551 U.S. at 422 (Alito, J., concurring). It's only about the precedential effect of *Morse*.

Although we are mindful of what the en banc Third Circuit said, we decline to view Justice Alito's concurrence in *Morse* as controlling. But even if we did, it would make no difference to the outcome of our case because nothing in that concurrence overruled *Fraser sub silentio*. As such, *Fraser* requires our conclusion that a school may prohibit students from wearing a slogan reasonably understood as profane or vulgar. In the schoolhouse, vulgarity trumps politics. And the protection for political speech doesn't give a student *carte blanche* to use vulgarity at school—even when that vulgarity is cloaked in innuendo or euphemism. Here, the school administrators reasonably interpreted the "Let's Go Brandon" slogan as being vulgar speech that "a school may categorically prohibit" despite its political message. *Barr*, 538 F.3d at 563–64. Requesting that students remove clothing with that slogan didn't violate the First and Fourteenth Amendments.

## III.

For this reason, we affirm.

---------------

**DISSENT**

---------------

JOHN K. BUSH, Circuit Judge, dissenting.  For a young person, wearing apparel with a political message can be the first point of entry to civic engagement.  One mother thought so when she gave her two sons sweatshirts bearing a political message—"Let's Go Brandon!"—as Christmas presents.  The phrase was a popular way for critics to express opposition to President Joe Biden's policies.  But when the students tried to wear their sweatshirts to protest the presidential administration, the school administration quickly ended their civic engagement.

The majority blesses this outcome without requiring that the school district meet the legal standard of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).  In *Tinker*, the Supreme Court held that students had a First Amendment right to wear black armbands to school in protest of President Lyndon Johnson's Vietnam War policies.  Under *Tinker*, student political speech may not be restricted in school unless the speech "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school" or might "reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.* at 509, 514.

Discarding the *Tinker* standard, the majority misapplies a narrow exception to *Tinker* recognized in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986).  There, the Supreme Court upheld a school district's disciplining of a student who, during a school assembly, gave a sexually explicit speech that had nothing to do with national politics.  Here, the majority concludes that a political slogan critical of a president but containing no words that are vulgar or profane—"Let's Go Brandon!"—looks more like the sexually explicit, non-political speech delivered in *Fraser* than it does the political criticism expressed through the black armbands in *Tinker*.

In my view, *Tinker*, not *Fraser*, should apply.  The district court erred in sidestepping that analysis, so the judgment for the school district should be vacated and this case should be remanded.  Because the school district does not dispute that these sweatshirts did not cause a

substantial disruption, on remand, the district court should view the constitutional issue as being resolved against the defendants and, as to the damages claims, should consider only whether the defendants are entitled to qualified immunity.

To be sure, in a limited category of cases, the explicit nature of the speech is so evident that courts need not apply the *Tinker* test. *See Fraser*, 478 U.S. at 685. But the speech here— "Let's Go Brandon!"—is neither vulgar nor profane on its face, and therefore does not fall into that exception. To the contrary, the phrase is purely political speech. It criticizes a political official—the type of expression that sits "at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality opinion)). No doubt, its euphemistic meaning was offensive to some, particularly those who supported President Biden. But offensive political speech is allowed in school, so long as it does not cause disruption under *Tinker*. As explained below, *Tinker* is the standard our circuit applied to cases involving Confederate flag T-shirts and a hat depicting an AR-15 rifle[1]—depictions arguably more offensive than "Let's Go Brandon!"

We are not the only circuit that applies the *Tinker* standard to arguably offensive political speech.[2] The majority's holding to the contrary goes against this consensus and, in so doing, creates at least two circuit splits described below.

Because even offensive political speech demands First Amendment protection, it is inappropriate to delegate unfettered discretion to school officials to characterize the phrase "Let's Go Brandon!" as vulgar and then regulate it outside the bounds of *Tinker*. The majority essentially gives school administrators boundless discretion—akin to "I know it when I see it," *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)—to redefine facially non-vulgar speech as vulgarity in order to ban it. And only by interpreting "Let's Go Brandon!" by its *political* meaning (as opposed to a *non-political* meaning, such as, for instance, student

---

[1]*C.S. ex rel. Stroub v. McCrumb*, 135 F.4th 1056, 1059, 1061–62 (6th Cir. 2025); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 333 (6th Cir. 2010); *Barr v. Lafon*, 538 F.3d 554, 557 (6th Cir. 2008).

[2]The majority does not distinguish between vulgar versus plainly offensive speech, and neither does *Fraser*, 478 U.S. at 683, so I take the majority's holding to apply to both vulgar and plainly offensive speech with equal force.

speech that cheers achievements of a classmate named Brandon) do the school officials claim authority to censor the message.  If we allow schools the power to censor political speech by recharacterizing it as vulgarity, we risk turning disagreement with political speech into justification for its censorship—something the First Amendment flatly forbids.

The school district has never argued that the sweatshirts led to a material disruption or that the clothing interfered in any fashion with the operation of the school such that censorship was constitutional, so, under *Tinker*, the students' constitutional rights were violated.  I therefore respectfully dissent.

**I.**

As the majority recognizes, "Let's Go Brandon!" has permeated American society.  The phrase, in whole or in part, has become a widely recognized political slogan, appearing prominently on politically themed merchandise—including T-shirts, hats, flags, and bumper stickers—as well as at campaign rallies, political protests, and even on billboards across the country.

The students' choice to don the "Let's Go Brandon!" sweatshirts reflects the phrase's political pervasiveness.  It goes beyond simple fashion or an expression of teenage rebellion disapproved of by parents and detached from any political significance.  Rather, the sweatshirts were *gifts* from the students' mother, who *approved* of her kids wearing the sweatshirts to school as an ideological statement.  By displaying the message on these shirts publicly, the students participated in the broader civic discourse, a notion that the Supreme Court has never rendered inappropriate for the school environment.

The majority says the sweatshirts' slogan is crude.  *See* Majority Opinion at 15.  But neither the phrase itself nor any word in it has ever been bleeped on television, radio, or other media.[3]  Not one of the "seven words you can never say on television" appears in it.[4]  Instead,

---

[3]*See, e.g.*, *Weekend Update: A Guy Named Brandon on "Let's Go Brandon*," Saturday Night Live (NBC television broadcast, Nov. 6, 2021), available at https://www.nbc.com/saturday-night-live/video/weekend-update-a-guy-named-brandon-on-lets-go-brandon/603909528.

[4]George Carlin, *Seven Words You Can Never Say on Television*, *on* Class Clown (Little David Records 1972).

the phrase has been used to advance political arguments, primarily in opposition to President Biden's policies and secondarily to complain about the way liberal-biased media treats conservatives.[5]  It serves as a coded critique—a sarcastic catchphrase meant to express frustration, resentment, and discontent with political opponents.  The phrase has been used by members of Congress during debate.[6]  And even President Biden himself, attempting to deflect criticism, "agreed" with the phrase.[7]

We cannot lose sight of a key fact: the students' sweatshirts do not say "F*ck Joe Biden." Instead, they bear a sanitized phrase made famous by sports reporter Kelli Stavast while interviewing NASCAR race winner Brandon Brown at the Talladega Superspeedway.  The reporter said the crowd behind them was yelling "Let's go, Brandon!"  She did not report the vulgar phrase that was actually being chanted.  The Majority even concedes Stavast may have used the sanitized phrase to "put a fig leaf over the chant's vulgarity."  Majority Opinion at 2. That is telling.

The misreporting thus became an original and curious meme that went viral.[8]  "Let's Go Brandon!" caught on in the public sphere as a national inside joke.  To some it alluded in memorable fashion to President Biden's level of performance in office.[9]  The phrase became like "Where's the Beef?"—the 1984 Wendy's slogan that former Vice President Walter Mondale

---

[5]*See* Jonathan Turley, *Yankee Doodling the Media: How 'Let's Go Brandon' Became a Rallying Cry Against News Bias*, The Hill (Nov. 3, 2021), https://thehill.com/opinion/technology/579771-yankee-doodling-the-media-how-lets-go-brandon-became-a-rallying-cry/.

[6]*See* Colleen Long, *How 'Let's Go Brandon' Became Code for Insulting Joe Biden*, Associated Press (Oct. 30, 2021), https://apnews.com/article/lets-go-brandon-what-does-it-mean-republicans-joe-biden-ab13db212067928455a3dba07756a160 ("Republican Rep. Bill Posey of Florida ended an Oct. 21 House floor speech with a fist pump and the phrase "Let's go, Brandon!").

[7]*See* Matthew S. Schwartz, *Man Who Said 'Let's Go, Brandon' to Biden on Christmas Eve Says He Was Only Joking*, NPR (Dec. 26, 2021), https://www.npr.org/2021/12/26/1068173175/man-who-said-lets-go-brandon-to-biden-on-christmas-eve-says-he-was-only-joking (reporting that President Biden said "Let's Go Brandon, I agree").

[8]*See* Jake Lahut, *'Let's Go, Brandon': The Right's New Anti-Biden Chant Comes From a NASCAR Broadcast Where NBC Sports Didn't Want to Drop an F-Bomb*, Business Insider (Oct. 13, 2021), https://www.businessinsider.com/lets-go-brandon-chant-origin-video-what-does-it-mean-2021-10.

[9]*See* Anthony Zurcher, *How 'Let's Go Brandon' Became an Anti-Biden Conservative Heckle*, BBC (Oct. 11, 2021), https://www.bbc.com/news/world-us-canada-58878473 (calling the Brandon phenomenon "a simple vessel for transmitting invective at a politician" and "raw frustration of a political movement").

used to highlight the lack of substance of a fellow presidential contender, Senator Gary Hart.[11] And its meaning had nothing to do with accusing President Biden of sexually inappropriate conduct, unlike "Ma. Ma. Where's My Pa?"—widely used in the 1884 campaign to reference presidential candidate Grover Cleveland's out-of-wedlock child.[12]  "Let's Go Brandon!" just cheekily expressed criticism of a president's leadership capabilities.

## II.

Harsh verbal and written attacks on presidents have precedents throughout American history.  Since Washington, Americans have mocked their leaders.  *See* Rufus W. Wilmot, *The Republican Court: Or, American Society in the Days of Washington* 122–23 (1854) (quoting April 7, 1789 letter from John Armstrong to General Horatio Gates anticipating ceremonial reception of Washington as elected president and noting that a "caricature has already appeared, called 'The Entry,' full of very disloyal and profane allusions"); Stephen Hess & Milton Kaplan, *The Ungentlemanly Art: A History of American Political Cartoons* 61 (1968) ("[The Entry] is known to have shown Washington riding on a donkey, led by his aide, David Humphreys.  The accompanying couplet read: 'The glorious time shall come to pass/When David shall conduct an ass.'").  Whether dubbing John Adams "His Rotundity"[13] to emphasize both his portly figure and his monarchical leanings (as seen in his support for aristocratic titles like "His Highness" and the Sedition Acts)[14] or labeling Andrew Jackson "King Andrew the First" to protest his veto of the

---

[11]George Lardner Jr. & Dan Balz, *Mondale Turns Combative, Clashes with Hart in Debate*, Wash. Post (Mar. 12, 1984), https://www.washingtonpost.com/archive/politics/1984/03/12/mondale-turns-combative-clashes-with-hart-in-debate/e004fc40-8aee-48d7-81fc-4e1b9d62b61c/.

[12]Michael F. Holt, *By One Vote: The Disputed Presidential Election of 1876* 224 (2008).

[13]*See* John R. Howe, *The Changing Political Thought of John Adams* 26 (1966) (highlighting Ralph Izard of South Carolina giving John Adams the title "His Rotundity").

[14]Consider the Sedition Act of 1798—part of the broader Alien and Sedition Acts—which made it a crime to write, print, or speak any criticism of the federal government.  *See* Sedition Act, 1 Stat. 596 (1798); *see also Ludecke v. Watkins*, 335 U.S. 160, 172 n.18 (1948); *New York Times Co. v. Sullivan*, 376 U.S. 254, 273–74 (1964). The Act was heavily criticized at the time as unconstitutional, with leading figures like Thomas Jefferson and James Madison drafting the Virginia and Kentucky Resolutions in response.  *See* Wayne D. Moore, *Reconceiving Interpretive Autonomy: Insights from the Virginia and Kentucky Resolutions*, 11 Const. Comment. 315 (1994). Though the Supreme Court never ruled on the Act's validity before it expired in 1801, later courts and commentators have widely condemned it as inconsistent with the First Amendment.  *See Sullivan*, 376 U.S. at 276. Congress eventually repaid the fines imposed under the Act, and President Jefferson pardoned those convicted,

Second Bank and his autocratic enforcement of the Trail of Tears, Americans have long expressed their politics through crude characterizations.[15]   William Henry Harrison was mockingly nicknamed "Old Granny" because of his old age, and his political allies tried to repurpose the phrase to show his experience.[16]   Martin Van Buren was dubbed the "Machiavellian Belshazzar"—a nod to his reputation as a cunning political operator and a recognition that his self-serving leadership during the Panic of 1837 mirrored the downfall of Babylon's last king who led his nation toward ruin.[17]   And Abraham Lincoln was called "The Dictator" by Southern secessionists and "Copperheads" alike after he suspended habeas corpus and exiled political opponents like Clement Vallandigham to try to preserve the Union.[18]

Some presidents have received more criticism than others.[19]  But the public square spares no president of ridicule, no matter his party.  And since the beginning, presidents have been expected to "be prepared to meet the attacks of both" those who "grumble" at them and those who "will laugh" at them, "with firmness and good nature."  Wilmot, *supra*, at 123.  Critiquing

---

reflecting a broad consensus that the law unconstitutionally suppressed criticism of government and public officials. *Id.*

[15]*King Andrew the First* (1833), lithograph, Library of Congress, available at https://www.loc.gov/item/2008661753/, depicts a caricature of Jackson, in regal costume, standing before a throne in a "pose reminiscent of a playing-card king," holding "a 'veto' in his left hand and a scepter in his right."  The "Federal Constitution and the arms of Pennsylvania (the United States Bank was located in Philadelphia) lie in tatters under his feet."  A book saying "Judiciary of the U[nited] States lies nearby.  Around the border of the print are the words 'Of Veto Memory,' 'Born to Command' and 'Had I Been Consulted.'"

[16]Robert Gray Gunderson, *Log Cabin Campaign* 74, 220 (1957); *Montgomery's Tippecanoe Almanac* 49–50 (1841) ("In 1812, when war was declared against Great Britain, this 'old granny' was placed in command of a large number of volunteers to protect the Indiana territory, and was afterwards appointed Commander-in-chief of the' Northwestern army.  'His conduct of that war—his turning the tide of disaster, and raising in triumph and victory the sinking flag of his country, the recovery of Michigan, the battle of the Thames, which destroyed the British army of Upper Canada, were also thought very considerable services for an 'old granny.'").

[17]*See* Thomas A. Bailey, *Presidential Saints and Sinners* 56 (1981).

[18]*See* Dennis J. Hutchinson, *Lincoln the Dictator*, 55 S.D. L. Rev. 284, 289 (2010).

[19]George Washington, for example, garnered less critique than, say, Thomas Jefferson.  *Compare* William Murrell, 1 *A History of American Graphic Humor, 1747–1938* 34 (1933) ("Cartoons in which George Washington figures are for some obscure reason exceedingly rare . . . .  It is probable that all cartoons reflecting on him have long since been destroyed by some of our too ardent patriots."), *with id.* at 49 ("Jefferson . . . also came in for many virulent graphic attacks"); Bailey, *supra*, at 126 (noting "no one-term President has ever accumulated so many pejorative nicknames" as Martin Van Buren).

presidents, regardless the degree, always has been and continues to be a prevalent political practice—even for young Americans.

The liberty to criticize the president is not a freedom that stops at the schoolhouse door. Students wishing to engage in politics are largely confined to do so through speech, considering their legal and institutional constraints. As mentioned, the students in *Tinker* wore black armbands in 1965 to protest President Johnson's Vietnam War policies. 393 U.S. at 504. By the 2000s, President George W. Bush became the target of students' political ire. One Michigan student wore a shirt displaying a photograph of the former president with the caption "International Terrorist" to express his feelings about President Bush's foreign policy and the imminent war in Iraq. *Barber ex rel. Barber v. Dearborn Pub. Schs.*, 286 F. Supp. 2d 847, 849 (E.D. Mich. 2003). Another student in Vermont wore a T-shirt calling President Bush a "Chicken-Hawk-In-Chief" and accusing him of being a former alcohol and cocaine abuser. *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 322 (2d Cir. 2006). In these cases, federal courts protected the students' speech.

We can credit the First Amendment for this longstanding American right to insult the president. The Free Speech Clause of the First Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. This Amendment, standing "as a sentry over one of the Nation's most indispensable freedoms through a proclamation clear and uncompromising," means Americans need not pull punches. *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 538 (E.D. Ky. 2024). Political boxing, particularly when it comes to presidents, is not governed by any Marquess of Queensbury Rules.

At the time of ratification of the First Amendment in 1791, free speech was understood to encompass the right to speak freely as to one's honest beliefs. *See, e.g.*, Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 251–53 (2017). And since *Gitlow v. New York*, the Supreme Court has recognized that, by virtue of the Fourteenth Amendment, this same right of honest expression disallows censorship of such speech by the states and their subsidiary entities, such as the school district here. 268 U.S. 652 (1925). Given this context, courts have been protective of political speech, including pointed words about presidents, even when such words are communicated in a school setting.

**III.**

That history calls for application of *Tinker* to this case.  Time and time again, the Supreme Court has reinforced as a first principle that students do not "shed their constitutional rights . . . at the schoolhouse gate."  *Tinker*, 393 U.S. at 506.  Of course, those rights are not absolute.  *See, e.g.*, *Fraser*, 478 U.S. at 682.  The constitutional rights afforded to students are not always coextensive with those enjoyed by adults in other forums.  *Morse v. Frederick*, 551 U.S. 393, 404–05 (2007) (quoting *Fraser*, 478 U.S. at 682).  But even so, the Court has made clear that the special characteristics of the school environment do not justify the suppression of student speech in all circumstances.  *See Tinker*, 393 U.S. at 508.

*Tinker* reflects this principle well.  There, school officials banned the anti-war armbands and suspended the students who wore them even though the students had engaged in a "silent, passive expression of opinion, unaccompanied by any disorder or disturbance . . . ."  *Id.* at 508.  Like the school officials here, the school district in *Tinker* did not ban all forms of political expression but singled out a particular opinion.  *Id.* at 510–11.  The Supreme Court held that prohibiting political speech in this way is unconstitutional unless the speech causes "material and substantial interference with schoolwork or discipline . . . ."  *Id.* at 511.

Since *Tinker*, this circuit has applied the substantial interference test to all cases involving student political speech.  Indeed, we have consistently applied *Tinker* to student expression that is arguably more "plainly offensive" than the phrase here.  For example, in *Barr*, a school banned the wearing of Confederate flag apparel because racial tensions at the school were high.  538 F.3d at 557.  We held that *Tinker* governed "because by wearing clothing depicting images of the Confederate flag students engage in pure speech not sponsored by the school."  *Id.* at 564 (citing *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 539–40 (6th Cir. 2001)); *see also Spiva*, 625 F.3d at 333.  Record evidence included incidents such as "racist graffiti that made general threats against the lives of African-Americans, graffiti containing 'hit lists' of specific students' names, physical altercations between African-American and white students, and a police lockdown at the school."  *Id.* at 557.  In light of that evidence, we held that, consistent with *Tinker*, the school's ban was justified because the "school officials could

reasonably forecast that permitting students to wear clothing depicting the Confederate flag would cause disruptions to the school environment." *Id.* at 566.

Similarly, in *McCrumb*, we applied *Tinker* to evaluate a school's decision to restrict a student from wearing a baseball cap bearing a white star, an image of an AR-15 style rifle, and the capitalized phrase "COME AND TAKE IT." 135 F.4th at 1059, 1061–62. We held that *Tinker* applied "in light of the special characteristics of the school environment" and because the speech did not concern vulgarity or illegal drug use. *Id.* at 1062. Considering the then-recent Oxford shooting, the *McCrumb* court held that the school was justified in restricting the wearing of the hat. *Id.* at 1067–68.

Other circuits have likewise applied *Tinker* to student political speech cases. In *Guiles*, as noted, the Second Circuit held that a shirt calling President Bush a "chicken-hawk president," "Lying Drunk Driver," and "Cocaine Addict," and showing his image with alcohol, drugs, and war imagery, was protected political speech under *Tinker* because the court determined that it was not "plainly offensive," did not cause substantial disruption, and was clearly political. 461 F.3d at 321, 322, 327–28. The Second Circuit in *Guiles* also explicitly declined to apply *Fraser*, cautioning the district court against expanding *Fraser*'s reach because *Fraser* only applies to speech that is "plainly offensive." *Id.* at 327–28.

In *L.M. v. Town of Middleborough*, the First Circuit considered whether a public middle school could prohibit a student from wearing a shirt stating, "There Are Only Two Genders." 103 F.4th 854, 860 (1st Cir. 2024). The school justified its ban under a dress code barring speech that demeaned students based on protected characteristics, including gender identity. *Id.* at 861. Although the shirt was viewed by some as offensive or exclusionary, the court held that *Tinker*, not *Fraser*, governed the analysis because the speech was ideological (or social) in nature—not lewd or vulgar. *Id.* at 873–74.

In *Taylor v. Roswell Independent School District*, students belonging to a pro-life religious group passed out rubber fetuses designed to represent the "actual size and weight of a '12 week old baby,' that is, a fetus at 12 weeks of gestation." 713 F.3d 25, 30 (10th Cir. 2013). After finding that the students "meant to convey a religious and political message," the Tenth

Circuit held that the students' speech could be regulated by school officials but only after concluding that regulation was justified based on *Tinker*'s requirements.  *Id.* at 35.

In each of these cases, students engaged in arguably offensive political speech.  And in each case, the circuit court applied *Tinker*.  I offer no opinion on the outcomes of these cases, but the standard of review is uniform—*Tinker* provides the applicable test.

**IV.**

The Supreme Court has carved out only three narrow exceptions to *Tinker*'s otherwise general rule.  *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187–88 (2021).  *First*, schools may prohibit "'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds."  *Id.* (quoting *Fraser*, 478 U.S. at 683, 685).  *Second*, schools may exercise editorial control over school-sponsored speech—such as in a school newspaper—"that others may reasonably perceive as 'bearing the imprimatur of the school,'" so long as the regulation is "reasonably related to legitimate pedagogical concerns."  *Id.* at 188 (cleaned up); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).  Though often grouped with student speech cases, this exception is more accurately understood as an application of the government's broader authority over speech it directly sponsors.  *See Kuhlmeier*, 484 U.S. at 271.  And *third*, schools may restrict student speech that "a reasonable observer would interpret as advocating illegal drug use," so long as that speech cannot "plausibly be interpreted as commenting on any political or social issue."  *Morse*, 551 U.S. at 422 (Alito, J., concurring); *see also id.* at 403 (majority opinion) ("[T]his is plainly not a case about political debate over the criminalization of drug use or possession.").

What do these three exceptions have in common?  *First*, they are grounded in widely shared social norms about categories of speech that are inherently inappropriate in the school context and may be restricted without any showing of disruption.  *Second*, and crucially, each exception reflects the Court's ongoing effort to strike a balance between preserving order in schools and safeguarding students' expressive rights.

While recognizing the role of schools in "teach[ing] by example the shared values of a civilized social order," *Fraser*, 478 U.S. at 683, the Court has consistently emphasized the

importance of protecting the rights of students to express views on political or controversial issues. *See, e.g.*, *Morse*, 551 U.S. at 403–04; *Tinker*, 393 U.S. at 511; *see also Kulhmeier*, 484 U.S. at 271–72; *Fraser*, 478 U.S. at 680–81. Consequently, the exceptions to *Tinker* must be construed narrowly and applied cautiously, with full awareness of that constitutional tradition.

In each instance, the Court permitted regulation not because the speech was merely controversial or unpopular, but because the nature of the speech reflected a type of expression that society generally agrees is unsuitable for the educational environment.

That consensus is absent here. "Let's Go Brandon!"—regardless its origin—has evolved into a widely recognized political slogan used to express opposition to a now-former president. It is not vulgar on its face, nor so socially deviant that it must be sanitized from student expression. It has become a political hallmark entitled to the First Amendment protection described in *Tinker*. The majority disagrees and holds that *Fraser* governs this case and that the vulgarity exception allows the school to censor the students' political speech. Majority Opinion at 7–8. Respectfully, the majority is wrong.

## A.

The majority's reading of *Fraser* conflicts with what that case said, and ignores how this court and our sister circuits have interpreted *Fraser*.

*Fraser* was not a case about political speech or political viewpoint. The Court upheld discipline for lewd and sexually suggestive speech at a school assembly, grounding its decision in the speech's pervasive sexual nature and its clear offensiveness to students and teachers alike. *See Fraser*, 478 U.S. 682–83. Crucially, the Court emphasized the "marked distinction" between *political* expression, like the silent protest in *Tinker*, and the "sexual content" of Fraser's speech. *Id.* at 680–81. Unlike *Tinker*, "the penalties imposed in [*Fraser*] were unrelated to any political viewpoint." *Id.* at 685. The Court criticized the lower court for giving "too little weight" to that difference, and then framed its analysis around that crucial distinction. *Id.*

Here, the district court, affirmed by the majority, failed to recognize that same distinction. A student wearing a "Let's Go Brandon!" sweatshirt is not engaging in the kind of

"offensively lewd" or sexually explicit speech in the way *Fraser* contemplated.  *Id.*  Although the phrase may carry a controversial or provocative undertone, it is fundamentally political—not plainly lewd or vulgar.  *See id.*  Even if some interpret the phrase as alluding to a vulgar sentiment, no one can argue that it stands for having sex, like the Court found objectionable in *Fraser* and therefore punishable consistent with the First Amendment.  *See* 478 U.S. at 683 ("The pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students—indeed to any mature person. . . .  The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality.").

Unlike *Fraser*, "Let's Go Brandon!" is not *plainly* lewd.  At most, the phrase indirectly references the use of the word "f*ck" as an intensifier in the Talladega crowd's chant—a word the students themselves never used.  The words "f*ck" or "f*cking," along with other swear words, are commonly used today to convey emphasis or strong emotion, rather than for their literal, sexual meaning.[20]  The Federal Circuit recently discussed the word "f*ck" in relation to a potential trademark and agreed with the Trademark Trial and Appeal Board that the word "has acquired a multitude of recognized meanings since its first recorded use," and it now serves as an expression "to convey a wide range of recognized concepts and sentiments."  *In re Brunetti*, No. 2023-1539, 2025 WL 2446503, at *5 (Fed. Cir. Aug. 26, 2025) (cleaned up).  That's why many people, including prominent politicians, increasingly use such swear words when speaking to the media.[21]

One bemoans the regression of public discourse.  But for many people, "f*ck" is used simply as a rhetorical tool to capture attention for what they have to say.  The crowd did not chant the word at Talladega to advocate having sex with the former President.  And, again, the students here did not even use the word.  That makes their political message look more like the

---

[20]Melissa Mohr, *Holy Sh*t: A Brief History of Swearing* 6–7 (2016).

[21]*See* Adrienne Vogt, *Cory Booker On Gun Violence Reform: We Need More Than 'Thoughts and Prayers,'* CNN, May 11, 2019, at A1; Sudiksha Kochi, *Trump Normalized Politicians Swearing in Public. Why it Matters*, USA Today, March 24, 2024 ("But inflammatory rhetoric and the use of expletives in politics – once considered scandalous to use in public – has now become the norm among lawmakers and political candidates."); Adam Wren et al., *'Potty Mouth' Democrats Have Some New Fighting Words We Can't Put in This Headline*, Politico, March 9, 2025, at A1 ("Democrats are cursing up a storm.").

type of political expression that the Court has historically afforded greater constitutional protection under *Tinker*, than an expression of vulgarity that may summarily be banned under *Fraser*.

The majority relies on *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470 (6th Cir. 2000), to defend the school's decision to ban "Let's Go Brandon!" apparel. Majority Opinion at 11. According to the majority, *Boroff* affirms that *Fraser* gives schools broad discretion to define what is vulgar or profane, "so long as the decision is not unreasonable." *Id.* But this reading oversimplifies *Boroff*, ignores its specific context, and simply cannot be squared with our circuit's own student speech cases, much less Supreme Court precedent. If anything, our precedent—including *Boroff*—points in the opposite direction by supporting the application of *Tinker* in a case like this, where the speech is overtly political and lacks any plainly lewd or profane content.

Start with what *Boroff* actually held—and why. There, we upheld a school's decision to prohibit students from wearing a Marilyn Manson T-shirt because school officials reasonably determined that the conveyed message conflicted with the school's basic educational mission. *Id.* at 470. Relying on *Fraser* and *Kuhlmeier*, the *Boroff* court held that schools need not tolerate student expression inconsistent with their pedagogical goals, even absent evidence of substantial disruption. *Id.* And so, under those circumstances, the court concluded that the school did not act in a "manifestly unreasonable manner" in enforcing its dress code. *Id.*

However, *Boroff* involved a different kind of student expression—one that lacked any political (or religious) viewpoint and was widely associated with messages that the school considered harmful to its educational mission. *Id.* As the court noted, the record was "devoid of any evidence" that the shirt conveyed a political or religious message. *Id.* It instead featured imagery and slogans linked to a performer who was commonly portrayed "as having a 'pro-drug persona'" and known to "promote[] drug use"—arguably, anticipating *Morse*. *Id.*

This case presents just the opposite situation. "Let's Go Brandon!" is quintessentially political. Whatever else it may be, it is not a slogan devoid of political meaning or rooted in values hostile to education. Unlike *Boroff*, the record here contains no evidence that the

sweatshirt's message promotes drug use, violence, or any other category of speech the Court has held to be categorically regulable in schools. The absence of plainly lewd or vulgar language, plus the political valence, takes the case outside the scope of *Fraser* and thereby makes *Tinker* the proper analytical framework.

Even if the student's speech in *Fraser* could be construed as political, we have never interpreted *Fraser* so broadly to encompass euphemistic speech that *might* offend. When our cases have concerned political speech, we have interpreted the *Fraser* exception narrowly and applied the general rule, *Tinker*. In *Barr*, we read *Fraser* to allow schools to limit speech "in the interest of protecting children, especially those in captive audiences, from *sexually explicit*, vulgar, and offensive spoken language," emphasizing Fraser's use of "an elaborate, graphic, and explicit sexual metaphor." 538 F.3d at 563 (quoting *Fraser*, 478 U.S. at 677–78) (emphasis added). *Barr* limited *Fraser*'s holding to spoken language and did not allow school administrators to read in their own interpretations of non-explicit speech. *Id.*

Similarly, in *McCrumb*, we read *Fraser*'s holding narrowly as pertaining to "*distractingly* vulgar or lewd" speech. 135 F.4th at 1062 (emphasis added). We did not apply *Fraser* to either Confederate flag T-shirts or a hat depicting an AR-15, both of which carried political messages, and arguments could be made that these messages are more plainly offensive than any message associated with "Let's Go Brandon!"

Other circuits agree that *Fraser* should be read as a narrow exception to *Tinker*. In *Guiles*, for example, the Second Circuit declined to apply *Fraser* to a T-shirt insulting President Bush. 461 F.3d at 327. The district court here diminished *Guiles* by saying that "the undeniable connection between Let's Go Brandon and F*** Joe Biden distinguishes Plaintiffs' apparel from the shirt in [*Guiles*] calling President George W. Bush a crook, cocaine addict, draft dodger and lying drunk driver." Op., R. 56, PageID 937. That distinction is superficial at best. In fact, it undermines a key principle in *Guiles*: even blunt, harsh, or impolite criticism of public officials is protected when it is political speech that does not disrupt the school environment. Arguably, the *Guiles* shirt was far more offensive than "Let's Go Brandon!"—yet it was protected. The *Guiles* reasoning applies with equal force no matter which piece of apparel more greatly offends. The Second Circuit rightly held that *Fraser* should not be read to encompass all offensive

speech; otherwise the rule in *Tinker* would be swallowed completely.  *Guiles*, 461 F.3d at 327–28.

That's just what the majority's rule does here.  If the only standard for banning speech as vulgar is whether the school administrator's determination was reasonable or not, without any showing of school disruption, then *Barr*, *Guiles*, and even *Tinker* look completely different.  Could we really find unreasonable a school administrator's summary decision to ban Confederate flag T-shirts as plainly offensive given the racist underpinnings of the Confederacy?  Could we really say that, during the Vietnam War, black armbands could not reasonably be viewed by a school administrator as offensive, given their hurtful impact on fellow students whose relatives served in the military and who considered the war an honorable and just cause?  What's left of *Tinker*'s First Amendment protections in schools when we now must defer to school administrators in these decisions without any showing of disruption of school operations?  Majority Opinion at 12.  The answer: less than what the Constitution requires.  In our country, First Amendment protection "is the default and censorship the exception."  *L.M ex rel. Morrison v. Town of Middleborough, Mass.*, 145 S. Ct. 1489, 1495 (2025) (Alito, J., dissenting from denial of cert.).  The majority holds the reverse.

**B.**

The *Fraser* exception does not apply for a second reason.  The school here punished these students for expressing a disfavored political viewpoint, not for expressing a vulgarity.  The district court held that the speech restriction was justified under *Fraser* because "Defendants have established that a reasonable interpretation of the phrase Let's Go Brandon is that it conveys a profane and vulgar message."  Op., R. 56, PageID 931.  The district court then reasoned that because a school can "certainly prohibit" students from wearing apparel displaying "F*** Joe Biden," it may also necessarily sensor clothing "that can reasonably be interpreted as profane."  *Id.* at PageID 932–33.  The majority agrees, stating that there is something so unique about this facially non-vulgar speech that it warrants bypassing *Tinker* for *Fraser*.  The speech, says the majority, can be regulated under the *Fraser* exception because it can be reasonably seen as vulgar—even if it is not plainly vulgar.  *See* Majority Opinion at 11.

But "F\*ck Joe Biden" and "Let's Go Brandon!" are not functional equivalents. One is censored; the other is not. And that, simply put, is why *Tinker*—not *Fraser*—governs this case.

The district court and the majority stretch *Fraser* too far. They improperly expand *Fraser* to encompass speech that is not itself lewd or vulgar but merely associated with a political message that could be interpreted as offensive by some. In other words, the majority's reasoning would allow schools to regulate speech simply because some might assign a vulgar or profane meaning to a political phrase, even when others would reasonably see no such meaning. This grants schools unrestrained authority to suppress speech based on subjective interpretations, opening the door for viewpoint discrimination without any need for schools to justify their regulations.

And this case shows why these fears are reasonable. The "Let's Go Brandon!" sweatshirts were censored because of their political message, not because of their vulgar content. The majority rejects this premise and instead attempts to distinguish the armbands in *Tinker* by claiming that the sanctions here are linked to the vulgar content alluded to by "Let's Go Brandon!" and not the political content. Majority Opinion at 18. But the phrase itself is innocuous when divorced from the political message. Imagine a football player named Brandon making a big play, or a young student named Brandon winning a schoolyard race. Expressions of "Let's Go Brandon!" in those situations—whether written on a sign or cheered by the crowd—would be understood as expressions of encouragement and support. Surely the school would not prevent students from making signs with this message and bringing them to an upcoming game, or even wearing sweatshirts with the phrase to support Brandon the football star. The phrase can be used in everyday speech without any vulgar connotation. It only becomes "vulgar" once the political message is assigned to it. The supposed vulgarity in "Let's Go Brandon!" comes from its euphemistic association with a criticism of a political official. Without the political viewpoint attached to the words, no school administrator could possibly view the words "Let's Go Brandon!" as vulgar. Unlike in *Fraser*, the double meaning behind these words is a political one, not a sexual one—so instead of deserving less protection, it deserves more. Under the majority's rule, school officials now have the unrestrained discretion

to declare speech vulgar as soon as it is imbued with a political message, so long as the school administrator could reasonably understand the message to include an offensive connotation.

The inextricable link between the political viewpoint being expressed by the sweatshirts and the determination of vulgarity shows that it is not the vulgar content of the words themselves, but the political content that is actually being censored. This reality exposes a fundamental flaw in the majority's stated rule. The majority adheres to the principle that schools are entitled to broad discretion in determining what constitutes lewd or vulgar speech, provided their judgments are not unreasonable. However, if the phrase is treated as vulgar only because of its political implications—and not because of the actual words used—then the restriction is not really about lewdness at all. It is, presumably, about viewpoint in some form or fashion.[22] That distinction is constitutionally significant. The school cannot justify censorship by labeling speech as "vulgar" when, in reality, it is being restricted because of the message.

In these circumstances, we cannot—consistent with *Tinker*—delegate to school officials unfettered discretion to censor student speech, especially when that speech carries such clear political overtones. Accordingly, we must apply the *Tinker* standard and conclude that the school's actions were not justified by actual or reasonably forecasted disruption to school operations.

## C.

The Third Circuit's decision in *B.H. ex rel. Hawk v. Easton Area School District* reinforces why *Fraser* must be read narrowly, and why *Tinker* governs here. 725 F.3d 293 (3d Cir. 2013) (en banc). That case involved student bracelets reading "I ♥ boobies! (KEEP A BREAST)," worn to promote breast cancer awareness. *Id.* at 297–98. Although the message addressed a social issue, it was far more sexualized than the political euphemism at issue here, and thus much closer to the type of speech *Fraser* was meant to reach.

---

[22]The evidence shows that the school allows students to wear political clothing, and I don't dispute that. Indeed, the evidence shows that students wore clothing endorsing candidates from both of the major political parties. But the same was true in *Tinker* and the Supreme Court held that against the school. 393 U.S. at 510–11. Allowing other forms of political expression highlights that the school singled out this message for prohibition and "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.*

The court recognized *Fraser*'s uncertain limits.  *Id.* at 302 ("The mode of analysis employed in *Fraser* is not entirely clear.")  (quoting *Morse*, 551 U.S. at 404)); *see also Guiles*, 461 F.3d at 330 (acknowledging uncertainty in the Supreme Court's student-speech cases and noting that the "exact contours of what is plainly offensive [under *Fraser*] are not so clear").  Yet drawing on *Fraser*, *Morse*, and the Supreme Court's broader student speech jurisprudence, the court articulated a three-tiered framework it understood *Fraser* to establish.  Under its approach: (1) schools may categorically restrict plainly lewd speech, regardless of message; (2) they may restrict ambiguously lewd speech unless it plausibly comments on political or social issues; but (3) schools may not categorically restrict speech that is not plainly lewd and that could be seen as political or social commentary.  *Id.* at 298, 301.

The bracelets, although potentially viewed as lewd to some because of their sexually suggestive nature, fell into the second category.  *Id.* at 302.  They addressed an important social and health issue and bore "no resemblance to Fraser's 'pervasive sexual innuendo.'"  *Id.* at 320. The court thus rejected the school's ban and explicitly cabined *Fraser* to in-school speech that is overtly vulgar or sexually explicit.  *See id.* at 307 ("*Fraser* addressed only a school's power over speech that was plainly lewd—not speech that a reasonable observer could interpret as either lewd or non-lewd.").

That framework is relevant here, except that this case is easier.  Unlike in *Hawk*, the phrase "Let's Go Brandon" is not even ambiguously lewd, let alone plainly so.  Unlike "boobies," a term widely understood as referencing a sexual body part, the phrase at issue here is a euphemism for political criticism.  It contains no sexual content, no graphic imagery, and no actual profanity.  To the extent that it implies an offensive phrase, it does so obliquely—by design.

Even so, the Third Circuit's approach to reading *Fraser* narrowly makes good sense.  The Supreme Court has issued no directive that calls for expanding this exception.  Nothing in *Fraser* or any subsequent Supreme Court decision suggests that this exception should be extended to encompass political or euphemistic expression that is not overtly profane.

To that point, the Third Circuit's approach honors foundational First Amendment principles by preserving protections for student speech on issues of public concern, whether that be political, social, religious, or otherwise controversial speech.  It avoids inviting school officials to engage in subjective judgments about the perceived impropriety or inferred meaning of student expression—judgments that risk devolving into viewpoint discrimination.  By cabining *Fraser* to in-school, sexually explicit or plainly vulgar speech, the Third Circuit ensured that the core holding of *Tinker* remains intact: that students retain the constitutional right to express themselves on matters of public concern, so long as their expression does not materially disrupt the educational environment.  That balance best reflects the Supreme Court's consistent message that student speech is not a constitutional afterthought, but a protected and essential component of democratic discourse.  *See Mahanoy*, 594 U.S. at 190 ("America's public schools are the nurseries of democracy.  Our representative democracy only works if we protect the 'marketplace of ideas.'  This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will.").

And more still, the Third Circuit's reading of *Fraser* also makes particular sense in cases like this one where the doctrine of *in loco parentis* is ill-suited to justify the school's disciplinary authority.  Historically, *in loco parentis* presumed that schools acted in place of parents with the tacit or express consent of those parents.  *See id.* at 192.  But where, as here, the parent *wants* her sons to wear a non-vulgar sweatshirt to convey a political message, that foundational premise collapses.  *Tinker* itself involved a similar fact pattern: students engaged in peaceful political expression with their parents' knowledge and approval.  393 U.S. at 504.  There, parental endorsement stripped away the traditional justification for treating the school's authority as standing in for the parents'.  The same holds true here.

Indeed, the Court in *Kuhlmeier* acknowledged that "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials . . . ."  484 U.S. at 273.  But that deference assumes alignment, or at least not conflict, between the interests of parents and those of school administrators.  When those interests diverge—as they do here—courts should be skeptical of extending deference to the school over the parents.  The Third Circuit's approach reflects that principle: it respects the constitutional rights of both students and

the parents who support their children's expression, and it resists vesting unilateral authority in school officials to override those rights under a broad reading of *Fraser*.

The majority, however, criticizes *Hawk* for "creating a new protected category of ambiguously vulgar political speech." Majority Opinion at 21. It argues that the Third Circuit wrongly treated Justice Alito's concurrence in *Morse* as controlling and built its framework around it. Majority Opinion at 19. Even assuming *Morse* reflects Justice Alito's narrow view, the majority contends it should not be read to limit *Fraser*, because *Fraser* and *Morse* establish separate exceptions to *Tinker*: *Fraser* governs vulgar speech, *Morse* governs drug advocacy, and conflating the two, according to the majority, creates doctrinal confusion.

But that argument overlooks what *Morse* reveals about *Fraser*. If *Fraser* were broad enough to authorize censorship of any speech seen as "inappropriate" or "offensive," the Court in *Morse* could have relied on it. As could our cases analyzing speech involving Confederate flag and AR-15 apparel. Instead, the *Morse* Court declined to do so, affirming that *Fraser* does not reach all controversial or provocative speech. 551 U.S. at 409. Justice Alito's concurrence, which emphasized that *Morse* should not be used to restrict political or social commentary, helps clarify the outer bounds of any school authority to suppress student speech. The *Morse* Court created a distinct and narrowly tailored exception to *Tinker*, grounded in the government's compelling interest in deterring illegal drug use among students. And the *Morse* Court's refusal to resolve the case under *Fraser* confirms that *Fraser* does not give schools a roving license to suppress expression they may view negatively. *Fraser* instead represents a limited carveout for plainly lewd or profane speech delivered in the school context.

The Third Circuit's approach does not confuse these precedents—it preserves them. It treats *Fraser* and *Morse* as distinct, limited carveouts and reaffirms *Tinker* as the baseline rule. What it properly rejects is the idea that school officials may suppress political expression by loosely labeling the speech as vulgar and defying their burden to justify their regulation. That view not only distorts *Fraser*, it opens the door to viewpoint discrimination and undermines the First Amendment's core protection for political speech. *Hawk* honors those constitutional boundaries by cabining *Fraser* to plainly lewd or sexualized expression, ensuring that *Tinker* remains the governing rule for political speech in schools.

## V.

By reaching the holding it does today, the majority creates a split with other circuits on two issues.  *First*, the majority creates a split with the First and Second Circuits by applying *Fraser*, rather than *Tinker*, to student speech that expresses an ideological slogan (*L.M.*) and criticizes a president (*Guiles*).  The First and Second Circuits have applied *Tinker* when faced with these types of speech.  *See L.M.*, 103 F.4th at 873–74; *Guiles*, 461 F.3d at 327–28.  Only the majority has applied *Fraser*.  By applying *Fraser*, the majority ignores what is obvious to these other circuits: political speech expressed through facially non-obscene apparel looks much closer to the armbands in *Tinker* than it does to the sexually explicit speech in *Fraser*.

*Second*, the majority's interpretation of *Fraser* that expands its scope to political and not "plainly lewd" speech splits with the Third and Ninth Circuits.  *See Hawk*, 725 F.3d at 298; *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 530 (9th Cir. 1992).  Those circuits apply *Fraser* only when the speech at issue is "per se vulgar, lewd, obscene, or plainly offensive," and not just "ambiguously lewd" like the speech here.  *Hawk*, 725 F.3d at 308; *Chandler*, 978 F.2d at 530.  "Let's Go Brandon!" can be said without any vulgar or offensive undertones, so it cannot possibly meet the standard of being per se vulgar.  This is no problem for the majority.  Whether something is actually vulgar or just vulgar in the mind of the school administrator makes no difference; the only question is whether a deferential court thinks the administrator had a reasonable belief that it might be.  The other circuits apply a more manageable and constitutionally faithful rule "grounded in bedrock First Amendment principles . . . ."  Recent Case, B.H. ex rel. Hawk v. Easton Area School District*, 725 F.3d 293 (3d Cir. 2013) (en banc)*, 127 Harv. L. Rev. 1049, 1049 (2014).  But, given the split, "the Supreme Court itself must ultimately clarify, and ideally limit, *Fraser*'s reach."  *Id.* at 1050.

## VI.

The majority fails to give due weight to our precedents and the message's political significance, both of which call for *Tinker* analysis to apply here.  I agree with the Supreme Court in *Kuhlmeier* that educating "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."  484 U.S. at 273.

But federal judges still bear a responsibility—to ensure that those "state and local officials" do not trample the free speech rights of students while accomplishing their educational mission. Because the majority favors the mission of the officials over the rights of the students, I respectfully dissent.